MAIN, Judge.
Garrett Dotch appeals his conviction for capital murder for the intentional murder of Timarla Taldon by the use of a deadly weapon while she was in a vehicle, in violation of § 13A-5-40(17), Ala.Code 1975, and his resulting sentence of death. Dotch was indicted for two counts of capital murder: for intentionally killing Taldon by the use of a gun while she was in a vehicle, § 13A-5-40(a)(17), Ala.Code 1975; and for intentionally killing Taldon by shooting her when she was or had been subpoenaed to testify, or had testified in a criminal trial or proceeding, and the murder stemmed from, was caused by, or was related to her role as a witness. § 13A-5^10(a)(14), Ala. Code 1975. The jury found Dotch guilty as to the first count of the indictment and not guilty as to the second count. In the sentencing phase of Dotch’s trial, the members of the jury, by a vote of 10-2, returned an advisory verdict of death in favor of life without parole. A separate sentencing hearing was then held before the trial court, and the judge accepted the jury’s recommendation and sentenced Dotch to death.
The State’s evidence showed the following. Dotch and Taldon attended middle school together and began a dating relationship. Subsequently Taldon moved from her parent’s home and rented an apartment; Dotch lived with her until their relationship ended in 2002. (R. 964, 975.) Dotch had dropped out of school at the age of sixteen, but Taldon had completed high school and was attending college at the time of her death.
On September 1, 2003, Lt. Stephanie Smith of the assaults units of the Mobile Police Department testified that she responded to a call at Taldon’s apartment concerning a burglary complaint. She stated that the door to the apartment had been splintered and “kicked in.” (R. 817.) She testified that Taldon had suffered bruising to her right eye and that there was blood inside her eye. (R. 817.) Dotch was arrested and pleaded guilty to first-degree burglary and third-degree assault. *949 (R. 818-19.) He was sentenced to 15 years on each conviction, the sentences to be served concurrently. The sentences were split and the time of incarceration was set at time served, and he was placed on 5 years’ probation. (C. 641.)
Taldon’s mother testified that after the burglary, Taldon purchased a gun. (R. 964-66.) In May 2005, while on probation for the burglary and assault convictions, Dotch was arrested for third-degree domestic violence against Taldon and he again pleaded guilty. (C. 646, R. 835-36.) The Mobile municipal court sentenced him to 180 days, the sentence to run concurrently with the sentences for his other charges. After serving that sentence, Dotch was released to continue his probation for the previous offenses.
From the end of May 2006 until July 1, 2006, Taldon lived with her parents, although she continued to pay rent for her apartment. (R. 967.) Taldon’s mother then spent the week following July 1 with her daughter at her apartment. She testified that Dotch telephoned Taldon many times while she was there, although Tal-don did not want to talk to him and asked him to leave her alone. (R. 968-69.) When Taldon’s mother left the apartment on July 8, 2006, two of Taldon’s cousins remained with her at her apartment. (R. 968, 949.)
Taldon’s cousin, Jiquisa Thomas, testified that during the first week of July 2006 she was present when Dotch telephoned Taldon approximately 20 times. (R. 950.) In the early morning of Sunday, July 9, 2006, at approximately 2:00 a.m. or 3:00 a.m., she was present at the apartment with her sister, Taldon, and Taldon’s current boyfriend. Someone began knocking loudly at the door, and Thomas saw Dotch standing outside the apartment. (R. 951.) Thomas knocked on Taldon’s bedroom door and told her that Dotch was at the door. When Taldon went to the door, Dotch attempted to force his way inside, and Taldon tried to shut the door to keep him out. Taldon successfully shut the door, and Dotch left. (R. 952.) Later in the morning, he returned and tried to get Taldon to leave her apartment, stating that he needed to talk to her and that he had placed money for her under her car. (R. 953.) Taldon told him to leave and that she was calling the police. Dotch left before the police arrived. (R. 953-54.)
Also on July 9, 2006, Dotch telephoned Taldon, and Taldon put him on a three-way call that included her mother. Tal-don’s mother testified that Dotch did not know that she was listening to the conversation. She stated that she heard him curse Taldon and tell her that he was going to kill her. (R. 971-72.) He also made disparaging remarks about Taldon’s current boyfriend. (R. 973.) When Tal-don’s mother told him to leave her daughter alone, Dotch hung up. Taldon’s mother testified that Dotch continued to telephone her daughter and that she instructed Taldon to call the police. (R. 973.) Cellular telephone records indicate that Dotch called Taldon 51 times on that day.
On July 10, 2006, at 9:35 a.m., according to Dotch’s cell phone records, he telephoned the Subway sandwich shop where Taldon worked. Willie Rodgers, a co-employee of Taldon’s, testified that Taldon routinely parked behind the sandwich shop, as she did on the day of the offense. He testified that he believed that something was wrong with Taldon on that day because of her behavior. However, despite their usual routine, at the close of her shift, he did not walk her to her vehicle. (R. 682.) He testified that she left early while he was in the restroom. A woman from the McDonald’s fast food restaurant adjacent to the sandwich shop ran into the *950 sandwich shop, alerting the occupants that something had occurred, and he ran out to the parking lot where he found Taldon dead in her vehicle. (R. 688.) Rodgers testified that Taldon’s right hand was in her purse between her legs, resting on a gun. (R. 684.) The driver’s side front door was open and her left hand and left leg were out of the vehicle, and the vehicle was in reverse. (R. 683, 689-90.) Rodgers testified that he and a co-employee carried Taldon into the sandwich shop and laid her on the floor. (R. 684.) Emergency personnel soon arrived and declared Taldon dead. (R. 688.)
Tracy Sayer testified that she was at the drive-through of the McDonald’s restaurant at the time of the offense. She testified that she heard three “successive pows that sounded like gunshots, coming from the direction of the Subway restaurant area, like in the parking lot.” (R. 698.) She then saw a man running at a “trot” from the parking lot and “there appeared to be something — it was black, kind of like a gun at this person’s side holding it still.” (R. 693-94.)[1] She described the man both in her statement[2] and at trial as dark-skinned with short, bushy hair, tall and of medium build. (R. 694.) She testified that he was wearing a white T-shirt and long, dark blue denim shorts. (R. 694.)
Sayer was shown a photographic array at the Subway sandwich shop immediately following the incident, which included the full faces of six men. (R. 698.) She informed the officer that she was not “one hundred percent sure” that the perpetrator’s photograph was in the array. (R. 699.) She informed the officer that she had seen “more or less a profile of the face” or the right “side of the body” of the man as he ran away. (R. 698-99.) Therefore, Sayer told the officer that she would feel more comfortable making the identification if she could see the “profile versus a full face.” (R. 700.)
Around 9:00 or 10:00 p.m., she was shown a second photographic array, which consisted of the right profiles of six men. (R. 700-01.) She identified the photograph of Dotch from the array. (R. 701.) At trial, Sayer identified Dotch as the man she had seen “trotting” away from the vehicle in which Taldon’s body was found. (R. 695.)
Brittany Slack, an employee of the McDonald’s restaurant, testified that she was working at the second drive-through window at the time of the offense. (R. 707.) She testified that she heard gunshots and that after the third shot, she saw someone standing by the side of a vehicle. (R. 707.) Slack described the man as dark-skinned, between 20 and 26 years old, medium height, with a “low haircut.” (R. 707.) She stated that he was wearing a “white shirt and dark blue jean shorts.” (R. 708.) She testified that she saw him shoot at the vehicle and then run behind the McDonald’s restaurant. (R. 708.)[3] The officers showed her a photographic array at the McDonald’s restaurant and she tentatively identified Dotch as the man she had seen. (R. 710.)
*951 Later, the police brought her a single photograph depicting the profile of Dotch and she positively identified him as the man she had seen in the parking lot. (R. 710.) Slack also identified Dotch at trial as the man that she had seen. (R. 708.)
Brandi Moore testified that she was working at the first drive-through window of the McDonald’s restaurant at the time of the offense. (R. 721.) She testified that she saw a woman walk to a vehicle in the parking lot of the Subway sandwich shop; a man approached the. woman. Moore stated that she saw the man and woman talking, and then the woman got into the vehicle. Moore heard three gunshots and saw the man run behind the McDonald’s restaurant. (R. 722-23.) She described the man as African-American, in his “early to mid 20s,” with a “low” haircut, approximately 5'6" to 5'8" tall, and as having a medium complexion. (R. 722.) She also stated that he was wearing a white shirt and blue-jean shorts. (R. 722.)
Moore also testified that, after the shots, the vehicle rolled into a truck. (R. 724.) The occupant’s “legs was (sic) hanging out of the car and the door was opened.” (R. 724.)
The following day, she was shown a photographic array and tentatively identified Dotch as the man whom she had seen. (R. 723, 726-27.) In court, she identified Dotch as the man she saw in the parking lot. (R. 723.)
Bonita Lynn Gregg testified that she was in line at the first window of the drive-through of the McDonald’s fast-food restaurant at the time of the offense and she heard what she believed was a “car backfiring.” (R. 734.) She stated that she heard three “bangs” and that she saw a man running from the direction of the Subway sandwich shop toward the back of the McDonald’s restaurant. (R. 734-35.) She described him as an African-American man “in his 20s” and believed that he was wearing shorts and that they were blue and red. (R. 735.)
When she looked to determine the source of the noise, she saw a vehicle behind the Subway sandwich shop slowly start rolling and hit a parked vehicle. (R. 736.) She stated that the driver’s door was open and that what appeared to be a foot was hanging out of the door. (R. 736.) As soon as possible, she drove to the vehicle, went to the opened door and attempted to determine if the injured occupant had a pulse; she could not find one. (R. 737.) Gregg was shown a photographic array and was unable to identify anyone as the man she had seen running in the parking lot. (R. 737.)
The following day, Dotch’s father drove him to the police station in Mobile where he gave a statement followed immediately by a second statement. (R. 934-35.)
The State introduced evidence indicating that Taldon sustained gunshot wounds to her left chest, the outer part of her arm, her left collarbone, and adjacent to her neck. (R. 994.) The first two wounds were fatal. (R. 1001.) Two shell casings were found in the vehicle and two were on the pavement outside the vehicle. Three bullets were also found in the vehicle: one in the console, one in the front passenger’s seat, and one on the rear right floorboard. (R. 744-48.) The three bullets were fired from the same handgun, and the four casings were fired from the same handgun; however, without the gun, the expert was unable to determine whether the same gun discharged both the bullets and the casings. (R. 877.) A palm print found on the driver’s window matched Dotch’s left palm print. (R. 787.) Additionally, bloodstains were found on the driver’s seat. (R. 946.)
*952 Dotch introduced expert-. and lay-witness testimony that he was mentally ill[4] and was unable to appreciate the nature and quality of his actions at the time of the offense. (R. 1120.) The State presented rebuttal testimony from another expert who opined that Dotch showed no indication of any difficulty that would have prevented him from understanding and appreciating his actions, other than that associated with the voluntary use of cocaine. (R. 1212.)
I.
Dotch argues that the trial court erred by improperly admitting what he says was unreliable identification testimony based on impermissibly suggestive police-identification procedures. Specifically, Dotch contends that the admission of the identification evidence from the three witnesses was erroneous because of the improper conduct and procedures by the police and the unreliability of the witnesses’ identifications at the time of the offense. He therefore alleges that the witnesses’ in-court identifications were inadmissible.
Dotch argues that improper and suggestive procedures by the police resulted in his identification as the perpetrator of the shooting by three witnesses who were present at the crime scene. He argues different improprieties as to each of the witnesses.
A.
As to Brittany Slack, an employee at the McDonald’s fast-food restaurant located next to the Subway sandwich shop, Dotch argues that the police should not have shown her a single photograph after she failed to make a positive identification in the original photographic array; that the photographic array consisted of photographs that were insufficiently similar to each other or to Slack’s description; and that the presence of an officer during the identification procedure was unduly coercive.
Although the use of a single photograph for purposes of identification raises the question of possible suggestiveness, it “does not necessarily inject prejudice.” Hutchinson v. State, 516 So.2d 889, 894 (Ala.Crim.App.1987), citing United States v. Baxter, 492 F.2d 150 (9th Cir.), cert. dismissed, 414 U.S. 801, 94 S.Ct. 16, 38 L.Ed.2d 38, (1973), cert. denied, 416 U.S. 940, 94 S.Ct. 1945, 40 L.Ed.2d 292, (1974); Kalmbach v. Jones, 488 F.2d 134 (5th Cir.1973), cert. denied, 417 U.S. 913, 94 S.Ct. 2614, 41 L.Ed.2d 218 (1974). “Although a one-man showup is inherently suggestive, ‘it does not necessarily follow that the procedure [is] unduly suggestive so that it would taint [a] subsequent in-court identification.’ Quarles v. State, 711 So.2d 1115, 1117 (Ala.Crim.App.1997). See also Nichols v. State, 624 So.2d 1328, 1338 (Ala.Crim.App.1992) (although one-man show-ups ‘are by their nature suggestive, they are not necessarily unduly so’), and Cooley v. State, 439 So.2d 193, 195 (Ala.Crim.App.1983) (‘the mere fact that the appellant was subjected to a one-man showup does not necessarily render that identification procedure impermissibly suggestive’).” Gavin v. State, 891 So.2d 907, 960 (Ala.Crim.App.2003), cert. denied, Ex parte Gavin, 891 So.2d 998 (Ala.2004), cert. denied, Gavin v. Alabama, 543 U.S. 1123, 125 S.Ct. 1054, 160 L.Ed.2d 1073 (2005).
“In Ex parte Appleton, [828 So.2d 894 (Ala.2001),] this Court noted:
*953 “< «'phg (janger inherent in a one-man showup, where a witness is shown a single suspect and asked, ‘Is that the man?’ is twofold. First, a one-man showup conveys a clear message that ‘the police suspect this man.’ Second, a one-man showup does not give the witness a choice of identifying another person as being the perpetrator of the crime charged. Consequently, when a one-man showup is used to identify the perpetrator of a crime, the reliability of the witness’s identification is not put to an objective test, such as a live or photographic lineup, in which a single suspect must be chosen from a group of persons possessing similar physical characteristics.” ’
“828 So.2d at 899-900 (quoting Ex parte Frazier, 729 So.2d at 254-55 [ (Ala.1998) ] (citations omitted) (emphasis omitted)).”
Ex parte Wimes, 14 So.3d 131, 138 (Ala.2009).
Courts have determined that the danger inherent in an identification based on a single photograph lies in the fact that “the reliability of the witness’s identification is not put to an objective test, such as a live or photographic lineup, in which a single suspect must be chosen from a group of persons possessing similar physical characteristics.” Ex parte Frazier, 729 So.2d 253, 254-55 (Ala.1998). Here, however, Slack was originally shown a six-man photographic array from which she tentatively identified Dotch. Thus, her identification had already been put to an objective test.
Moreover, despite the danger in the reliability of an identification of a perpetrator from a one-man showup, “ ‘it is permitted where conducted promptly after the commission of a crime or demanded by necessity, emergency or exigent circumstances.’ Brazell v. State, 369 So.2d 25, 29 (Ala.Crim.App.1978), cert. denied, 369 So.2d 31 (Ala.1979).” Ex parte Appleton, 828 So.2d 894, 899 (Ala.2001). Here, Slack testified that she was shown the six-man photographic array immediately after the offense and that she was shown the single photograph “not over ten minutes” later. (R. 710, 712.) Agent Ben Kinsey, of the Mobile Police Department, testified that the officers learned the name of the suspect at the scene of the offense and called the police station where the array was assembled. (R. 919.) It was then delivered to the scene, where it was shown to Sayer and Slack. (R. 919, 920.) Agent Kinsey also stated that the first photographic array was composed of frontal pictures and that from that array Slack tentatively identified Dotch as the perpetrator. Slack informed Agent Kinsey that, because she was standing in the McDonald’s restaurant drive-through window, she saw only a profile as the man passed by her. (R. 920.) Agent Kinsey then showed her the single picture of Dotch in profile, and she positively identified Dotch. (R. 920.)
Dotch further alleges impropriety concerning the identification procedures used by the police, specifically as to the composition of the photographic array originally shown to Slack. Dotch argues that the array included photographs of men with varying skin tones and builds. He also argues that all the photographs in the array did not match the witnesses’ descriptions of the perpetrator because the witnesses all stated that the perpetrator had short hair, but one of the men in the photographic array was bald.
A review of the six frontal pictures in the photographic array reveals that all six men had similar features, builds, and skin tones. They appear to be of the same age group, and the background is the same in all of the photographs. (State’s Exhibit *954 82, C. 708.) Moreover, although one of the men is bald, the other five have short hair.
“ ‘On the whole, the physical appearance of [Dotch] is not so dissimilar to that of the other line-up participants that it renders the line-up unduly suggestive.’ Jones v. State, 450 So.2d 165, 170 (Ala.Crim.App.1983), aff'd, 450 So.2d 171 (Ala.1984), cert. denied, 469 U.S. 873, 105 S.Ct. 232, 83 L.Ed.2d 160 (1984).” Burgess v. State, 827 So.2d 134, 170 (Ala.Crim.App.1998), affirmed, Ex parte Burgess, 827 So.2d 193 (Ala.2000), cert. denied, Burgess v. Alabama, 537 U.S. 976, 123 S.Ct. 468, 154 L.Ed.2d 335 (2002). See Hunter v. State, 802 So.2d 265, 271-72 (Ala.Crim.App.2000), cert. denied, 802 So.2d 273 (Ala.2001) (holding that although the backgrounds in three of the six photographs in the array was a lighter shade of gray and Hunter was the only man in a striped shirt, the lineup was not unduly suggestive); Burgess v. State, 827 So.2d 134 at 169-170 (holding that the photographic array was not unduly suggestive although Burgess was the only man wearing a windbreaker and was the only man standing against a blank wall and his photo was the most recent); Elston v. State, 687 So.2d 1239, 1241 (Ala.Crim.App.1996) (holding that the photographic lineup was not impermissibly suggestive because other men in the lineup were of similar appearance and, although Elston’s photograph was folded or mutilated and imperfectly developed, the other photographs were also defective); Childers v. State, 339 So.2d 597, 599-600 (Ala.Crim.App.), cert. denied, 339 So.2d 601 (Ala.1976) (holding that although a witness identified the suspect in a robbery of a convenience store as wearing a red sleeveless shirt, and Hunter was the only participant in the lineup wearing a red sleeveless shirt, there was no likelihood of misidenti-fication).
Dotch also argues that the police officer’s presence during Slack’s identification was unduly suggestive. He contends that the officer’s presence during the 10-to 15-minute period when she viewed the photographic array resulted in coercive pressure because of Slack’s age — she was 15 years old. Dotch cites to no evidence or specific facts indicating any such pressure.
“ ‘Pre-trial identifications are to be set aside on grounds of prejudice only if the pre-trial identification procedure is so impermissibly suggestive as to give rise to a substantial likelihood of misidentification. Scott v. State, 479 So.2d 1343 (Ala.Crim.App.1985). The totality of the circumstances surrounding the out-of-court identification need be analyzed only when the pre-trial procedures used were unnecessarily or impermissibly suggestive. Coleman v. State, 487 So.2d 1380 (Ala.Crim.App.1986). The fact that witnesses are shown photographs does not establish suggestiveness. Matthews v. State, 401 So.2d 241 (Ala.Crim.App.1981), cert. denied, 401 So.2d 248 (Ala.1981).’
“Ex parte Stout, 547 So.2d 901, 904 (Ala.1989).”
Musgrove v. State, 638 So.2d 1347, 1351 (Ala.Crim.App.1992), affirmed, Ex parte Musgrove, 638 So.2d 1360 (Ala.1993), cert. denied, Musgrove v. Alabama, 513 U.S. 845, 115 S.Ct. 136, 130 L.Ed.2d 78 (1994). Slack’s age raises a question of weight to be accorded her identification by the trier of fact. Cf. Bradley v. State, 337 So.2d 47, 50 (Ala.Crim.App.1976) (finding that the young age of a 17-year-old defendant “does not in and of itself require a rejection of a confession otherwise admissible”).
Here, there is no indication that the officer’s mere presence during Slack’s viewing of the photographs resulted in any coercion that resulted in a substantial risk of misidentification. Jackson v. State, 361 *955 So.2d 1152, 1154 (Ala.Crim.App.1977). Slack testified that when she was shown the photographic array, the police officer who was present made no suggestion to her as to who she should pick from the photographs (R. 166, 717) or that she had to pick any photograph from the array. (R. 167,179.)
Further, there is no indication that Slack’s young age would have caused the officer’s presence to somehow suggest the identification of Doteh’s photograph. There was no evidence of coercion or suggestiveness by the officer. The witness was mature enough to be employed, and her testimony demonstrates that she was certain of her identification. There is no indication that her age was a factor in her identification of Dotch or in any way caused her identification to be unreliable.
Moreover, even if the procedures used by the police in this case had been improper, Slack’s identification was reliable under the factors enumerated in Neil v. Biggers, 409 U.S. 188, 199, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972).
“‘In determining the constitutional adequacy of pretrial identification procedures and the admissibility of identification testimony, the central question is whether, under the totality of the circumstances, the identification was reliable. Manson [v. Brathwaite, 432 U.S. 98 (1977) ]. This determination involves the application of a two-pronged test.
“ ‘ “[T]he required inquiry is two-pronged. The first question is whether the initial identification procedure was ‘unnecessarily’ ... or ‘impermis-sibly’ ... suggestive. If it is found to have been so, the court must then proceed to the question whether the procedure found to have been ‘unnecessarily or ‘impermissibly' suggestive was so ‘conducive to irreparable mistaken identification’ ... or had such a tendency ‘to give rise to a very substantial likelihood of irreparable mis-identification’ ... that allowing the witness to make an in-court identification would be a denial of due process.” United States ex rel. Phipps v. Follette, 428 F.2d 912, 914-15 (2d Cir.1970).’
“Brazell v. State, 369 So.2d at 28-29 (emphasis added). See also Donahoo v. State, 371 So.2d 68, 72 (Ala.Crim.App.1979). In evaluating the likelihood of misidentification, the court must consider the following factors:
“‘[1] the opportunity of the witness to view the criminal at the time of the crime, [2] the witness’s degree of attention, [3] the accuracy of the •witness’s prior description of the criminal, [4] the level of certainty demonstrated by the witness at the confrontation, and [5] the length of time between the crime and the confrontation.’
“Neil v. Biggers, 409 U.S. 188, 199, 93 S.Ct. 375, 382, 34 L.Ed.2d 401, 411 (1972) (emphasis added). See also Ex parte Frazier, [729 So.2d 253 (Ala.1998) ].”
Ex parte Appleton, 828 So.2d at 900.
In the present case, Slack had the opportunity to observe the perpetrator in the parking lot at the time of the offense. She was standing in the drive-through window that faces the parking lot in which the murder took place. There was testimony that the distance between the window and the victim’s vehicle was 78 feet and 10 inches. (R. 810-11.) She testified that she heard two shots and then looked out the window and saw a man with a gun standing by the vehicle. She then saw him fire the gun as she heard the third shot. (R. 164-65, 172-76.) She watched him run *956 behind the McDonald’s restaurant before she moved from the window. (R. 176-77.)
Slack became attentive to the offense and the perpetrator after the first two gunshots and clearly saw the man fire the third shot and run away. Although she did not specifically testify as to her degree of attentiveness, she was able to give a detailed description of the man, “which indicates a fair degree of attention on [Slack’s] part.” Hull v. State, 581 So.2d 1202, 1206 (Ala.Crim.App.1990).
Slack’s description of Dotch was both detailed and accurate. She was able to describe his clothing and physical characteristics, including his skin color, haircut, height, and age. (R. 164, 707, 708.)
Slack’s identification was tentative at the time of the photographic array; however, she did select and sign the photograph of Dotch as the man she thought she had seen. When shown the single photograph of Dotch’s profile, which reflected the perpetrator from the angle that she had been able to observe, she was able to positively identify him. (R. 920.)
The length of time between the offense and Slack’s tentative identification at the photographic array was approximately two and a half hours. She signed the back of Dotch’s photograph at 5:00 p.m. (R. 166, 190); the offense occurred at approximately 2:30 p.m. Her positive identification was made 10 to 15 minutes later.
Based on the testimony given by Slack at the pretrial hearing on the motion to suppress the identification evidence in the present offense and on her testimony at trial, we conclude that her identification was sufficiently reliable.
B.
Dotch argues that the identification evidence from Tracy Sayer, who was in the drive-through lane at the McDonald’s restaurant located next to the Subway sandwich shop at the time of the murder, was unreliable because, he says, the police engaged in improper conduct during the identification procedure. Specifically, he argues that the police made suggestive signals to her as she was looking at the array, that the photographic array was improper, and that the presence of several officers during the identification procedure was coercive.
Dotch alleges that the officers signaled Sayer or otherwise informed her of which photograph displayed the perpetrator. He specifically contends that by having Sayer sign next to the “checked ‘tentative’ box” of the first photographic array, the officers implicitly informed her that the suspect did appear in this array. (Dotch’s brief, at 31.)
However, there is no indication from the testimony presented at the pretrial suppression hearing or at trial that the officers suggested to Sayer that she should pick a certain, or indeed any, photograph from the array. At the suppression hearing, Sayer testified that after looking at the first array, she could not positively identify the man she had seen and that she would feel better seeing pictures showing profiles. (R. 133.) She testified that the officer who administered the identification did not suggest that she should pick a certain photograph or tell her that the man who committed this offense appeai’ed in the array. (R. 134-35.) She testified that he may have told her that the suspect may or may not have been present in the array. (R. 136.) She further stated that the officer did not assist her in any way in picking out the suspect. (R. 136.)
She testified that she did not recall signing the back of the array, but she identified her signature and stated that the array showed that it was a “negative i.d.” (R. 137.) The record contains a copy of the *957 reverse side of State’s Exhibit 82, which is the first photo array. (S.38.) This shows that Sayer’s identification was marked as negative. The tentative box is not checked, and Slack’s signature appears in the column designated for the witness’s signature; this column is located to the right of the “remarks” column rather than next to the “tentative i.d.” box. Thus, there was no impropriety by the police on this ground.
Dotch’s argument that Sayer’s identification was based on an improper photographic array refers to the fact that she was shown a second array from which she made a positive identification.[5] Dotch contends that because his photograph was the only one that was in the second photographic “array” and because Sayer knew that her first identification was incorrect, her positive identification from the second photograph was unreliable.
In Wright v. State, 641 So.2d 299 (Ala.Crim.App.1993), Wright alleged that the pretrial identification was tainted because his was the only photograph included in more than one lineup.[6] This Court held that the identifications were not unreliable and stated that the officer “did nothing to call attention to the appellant’s photograph or to coerce the witnesses into choosing the appellant’s photograph. The identification procedures were not unduly suggestive, although the appellant’s picture was included in more than one photographic grouping.” Wright v. State, 641 So.2d at 300-301.
Similarly, in Ex parte Johnson, 620 So.2d 709 (Ala.1993), on remand to, Johnson v. State, 620 So.2d 714 (Ala.Crim.App.1993), cert. denied, Alabama v. Johnson, 510 U.S. 905, 114 S.Ct. 285, 126 L.Ed.2d 235 (1993), Johnson alleged that because his photograph was included in two photographic arrays and he then appeared in a lineup before he was identified by the witness, “the process of identification was improperly repetitive.” Ex parte Johnson, 620 So.2d at 712. The Court stated:
“In this case, there is no indication that the police repeatedly arranged confrontations between Johnson and [the witness]; the mere fact that [the witness] was shown Johnson’s picture and also saw him in the line-up does not establish any impropriety in the identification process. Under Alabama law, it is not error to have a defendant participate in both a photographic array and a line-up, even though he may be the only common participant in the two procedures. Nicholes v. State, 409 So.2d 454 (Ala.Crim.App.1981).... Moreover, the record indicates that the individuals in the photographic array and the line-up were physically similar to Johnson. The officer in charge of choosing the individuals for the line-up testified at trial that he took special care to locate participants who resembled Johnson, so that it would be as difficult as possible for [the witness] to distinguish Johnson. Because these pretrial identifying procedures did not make [the witness’s] identification of Johnson inevitable, the Court of Criminal Appeals correctly held that the pretrial identification procedures were not impermissibly suggestive and that [the witness’s] identification testimony was properly presented to the jury for its consideration. We are not, *958 therefore, required to further examine the totality of the circumstances to determine whether there was a substantial likelihood of misidentification.”
Ex parte Johnson, 620 So.2d at 713.
Here also, as previously noted, the other participants in the photographic array resembled Dotch, so that his appearance in both arrays did not make Sayer’s identification of him inevitable. In fact, Sayer was shown both of the arrays by defense counsel at trial and asked whether any of the other participants were included in both of the arrays. She testified that “I’m not sure if there is only one particular person in both.” (R. 705.)
Moreover, Dotch’s allegation that, because Sayer knew that her first identification was incorrect, she knew that Dotch was the suspect because he reappeared in the second array, is without merit. Sayer did not make an incorrect identification; she was unable to make an identification in the first array.
Dotch also argues that the police conduct of “standing around” while Sayer viewed the photographs in the second array and of three officers’ sitting at the table with her as she viewed the photographs in the first array was unduly suggestive. (Dotch’s brief, at 32.) However, as previously determined, the mere presence of the officers does not indicate suggestiveness. See Part I.A., supra. There is no indication in the record that the officers were coercive or suggestive as to Sayer’s identification. Sayer testified that the officers did not suggest to her which photograph, if any, she should pick out of the array. (R. 136,137, 699, 700.)
Furthermore, Sayer’s identification was rehable under the factors enumerated in Neil v. Biggers, supra. Sayer had a good opportunity to view the man as he “trotted” across the parking lot following the gunshots. (R. 129, 130.) She testified that it was “a clear day” and that the time was about 2:30 in the afternoon. (R. 131.) Although she did not testify as to the degree of attention that she paid to the man, her description was detailed. See Hull v. State, 581 So.2d 1202, 1206 (Ala.Crim.App.1990). Moreover, this description given to the police was accurate and generally matched the other witnesses’ descriptions. She described his clothing, his skin color, his height and build, and his haircut. (R. 130, 694.)
As to hér level of certainty at the confrontation, she testified that she was unable to positively identify anyone from the first photographic array. She stated that she told the officer that she was “not a hundred percent sure the person [she] saw was there and that [she] had seen more of a profile and that [she] would feel more comfortable looking at a profile versus a full face, that [she] felt better identifying that person at a profile.” (R. 700.) Approximately five hours later, at 9:00 or 10:00 p.m., she was shown the second array of men in profile and was positive of her identification of the profile photograph of Dotch as the man that she had seen running in the parking lot at the time of the offense. She also testified that she first spoke to the police about an hour following the offense at which time she was shown the first array. (R. 695.) She was shown the second array later the same night.
Thus, Sayer’s testimony indicates that her identification was reliable based on her observations at the time of the offense. Moreover, there was no evidence of impropriety in the identification procedures used by the police.
C.
Dotch argues that the identification made by Brandi Moore, an employee at *959 the McDonald’s fast-food restaurant who was working at the first drive-through window, was unreliable because, he says, the police used improper procedures to obtain her identification. Specifically, Dotch contends that the police coached her by informing her that the suspect appeared in the array[7] and had been involved in an ongoing dispute with the victim; by informing her that she had made the right decision by identifying the suspect in the array; and by pressuring her to make an identification.
Dotch alleges that the police coached Moore by telling her, before she viewed the array, that they had a suspect who had been involved in an ongoing dispute with the victim and that this suspect’s photograph was included in the array. The transcript of the pretrial suppression hearing shows that Moore was confused as to the exact nature of the prosecutor’s questions concerning whether she was told to pick out a particular photograph. She did not understand the import of certain semantics being used, and she became upset so that another witness had to be called to the stand in order to give Moore an opportunity to collect herself. The following transpired at the pretrial suppression hearing during Moore’s direct examination:
“Q ... And that detective, did that detective tell you which photo to pick?
“A No, ma’am. He just told me to pick which one that I recognize.
“Q Okay. And did he tell you, you had to pick one?
“A I don’t remember.
“Q Well, in other words, did he say you must pick one of these photographs ?
“A He just told me to point one out.
“Q But did he say you had to pick one or did he say—
“[Defense counsel]: Your Honor, I object to arguing when the lady is giving her answer.
“THE COURT: Well, the other problem is I can’t hear the witness’s answer. You’re going to have to speak — Lean up a little bit and pull that toward your face. Pull that down toward — the microphone. And it doesn’t work very well, so just really speak up. Go ahead and ask it again, please.
“Q Okay. What I’m trying to understand, Brandi, is when — we’re just trying to get a better idea of what was the detective telling you about how you were — what instructions was he giving you about viewing a photo spread.
“A He just told me he was gping to show some pictures and for me to pick—
“THE COURT: I’m sorry, ma’am. It must be my ears and not your voice. Would you really make an effort to speak up, please, or maybe slow down a little bit? Go ahead and answer her question.
“Q Just speak loudly. It’s okay. It’s okay. You’re doing fine. I know this is difficult. You’re doing fine, okay? It’s okay. He told you what? It’s okay, sweetie. It’s okay. You’re doing fine.
“THE COURT: Do you want to give her a moment to step down and become composed and maybe call another witness?”
(R. 160-61.)
When Moore returned to the stand, the prosecutor resumed questioning her concerning the police officers’ instructions to her for identifying the man whom she had seen. She testified that no officer suggested to her that she should pick out a partic *960 ular photograph; neither did an officer tell her that “the person who did this will be in” the array. (R. 179.)
Later, during Moore’s cross-examination at the pretrial suppression hearing, the following transpired:
“Q All right. And when they showed you that photospread, did they tell you why they were showing you that photospread?
“A Um, I don’t remember.
“Q Well, did they tell you they thought they had somebody connected with this thing and they just wanted you to look in there and see if they were in there?
“A Yes, sir.
“Q All right. And did they tell you how they knew that the person they had in this photospread was whoever they thought was involved?
“A Yes, sir.
“Q How did they — what did they tell you?
“A That they — it was an ongoing dispute between them.
“Q Okay. So, they told you there was an ongoing dispute between the person that was shot; is that right?
“A Yes, sir.
“Q And somebody that was in that photospread?
“A Yes, sir.
“Q All right. And did they tell you that they had somebody that they thought was the one?
“A Yes, sir.
“Q And that that person was in the photospread?
“A Yes, sir.
“Q So, at that point, you knew that likely whoever it was, was in that photo-spread somewhere?
“A Yes, sir-.”
(R. 186-87.)
Moore testified on redirect examination at trial that no officer suggested that she pick a particular photograph, but rather, “they just told [her] to point to the one that [she] thought that it was.” (R. 726.) Her cross-examination and recross-examination did not address any possible suggestiveness by the police, and she again became upset shortly into the re-cross-examination and had to leave the stand.
Even if Moore was told prior to viewing the photographs that the suspect’s picture was included in the array, this would not alone make the photographic array impermissibly or unnecessarily suggestive. In Edwards v. State, 574 So.2d 864 (Ala.Crim.App.1990), Edwards claimed that the photographic lineup was tainted because the witness believed the culprit was among the photographs that she was shown. This court stated:
“This alone would not make the photographic lineup suggestive. Even if the police officer suggested to [the witness] that the robber’s picture was one of the seven pictures, this would not make the photographic lineup suggestive. This court has held in Jones v. State, 415 So.2d 1233 (Ala.Cr.App.1982), ‘that a person [who] is actually told the suspect’s photograph is among the pictures, although generally inadvisable, does not contaminate the identification proceeding.’ See Ramsey v. State, 441 So.2d 1065 (Ala.Cr.App.1983).”
574 So.2d at 867.
Moreover, even if an officer told her that the suspect’s photograph was included in the array, there is no indication that an officer informed Moore of which photograph depicted the suspect. In a similar situation, this court stated:
*961 “Here the police officer merely told one of the identifying witnesses that based on the description she had previously given the police, he had a suspect in the group of photographs he handed her to view. He did not indicate in any manner which individual he suspected. We find that the police officer was merely stating the obvious. The very purpose of a photographic display is to assist in the apprehension of offenders. Simmons [v. United States, 890 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968) ]. It would be a useless law enforcement procedure if a police officer showed a victim or a witness a spread of photographs where, based on a description. previously furnished him, he suspected none of the individuals depicted.”
Jackson v. State, 361 So.2d 1152, 1154 (Ala.Crim.App.1977.)
Moore clearly testified that she identified the man that she recognized from the photographic lineup and that the officers did not tell her which photograph she should select.
Dotch argues that the police signaled to Moore that she had made the correct identification when she signed the back of the photographic array next to the “tentative” box, indicating that she recognized photograph no. 2 as the perpetrator. He argues that because Sayer, another witness who had already made a positive identification of photograph no. 2, had signed the back of the array signifying that identification, Moore was notified that her identification was correct. (C. 35.)
However, Moore testified that she was shown the array and asked to pick the man she recognized as the man she saw in the parking lot. She affirmed that it was her signature on the back of the array, making a tentative identification of the man in photograph no. 2 because she believed he was the man she had seen. There is no testimony or evidence indicating that she read the other witness’s identification on the back of the array or that viewing a positive identification after making a tentative one would have affected or did affect her decision in any way. Speculation from a silent record will not support a finding of prejudice. Ex parte Walker, 972 So.2d 737, 755 (Ala.2007), cert. denied, Walker v. Alabama, 552 U.S. 1077, 128 S.Ct. 806, 169 L.Ed.2d 608 (2007). A reviewing court can not presume error from a silent record. “ ‘This court is bound by the record and not by allegations or arguments in brief reciting matters not disclosed by the record.’ Webb v. State, 565 So.2d 1259, 1260 (Ala.Cr.App.1990). See also Acres v. State, 548 So.2d 459 (Ala.Cr.App.1987). Further, we cannot predicate error from a silent record. Owens v. State, 597 So.2d 734 (Ala.Cr.App.1992); Woodyard v. State, 428 So.2d 136 (Ala.Cr.App.1982), aff'd, 428 So.2d 138 (Ala.), cert. denied, 462 U.S. 1136, 103 S.Ct. 3120, 77 L.Ed.2d 1373 (1983).” Whitley v. State, 607 So.2d 354, 361 (Ala.Crim.App.1992).
Dotch also argues that because Moore was only 17 years old at the time of the offense, she was particularly susceptible to the police’s suggestive techniques; he cites Oakley v. State, 457 So.2d 459 (Ala.Crim.App.1984), to support his argument. However, the witness’s age was not held to be a factor in Oakley. Rather, in that case, this court wrote of the witness:
“[The witness] testified at trial that she felt under pressure to ‘pick’ the person who assaulted her. On the way to the photographic lineup her mother had told her that it was her duty and responsibility to pick out a photograph from the array. [The witness] later described the procedure as ‘like a test ... I was afraid to choose because I was afraid of getting something wrong.’ ”
*962 457 So.2d at 460. The witness in Oakley also stated that she was told by police that the man she had originally picked out was not the man, which caused her to change her identification to Oakley. There was no finding that the witness’s age was a factor in determining the reliability of her identification.
Dotch also cites Mason v. United States, 414 F.2d 1176 (D.C.Cir.1969), to support his argument; however, that case is also distinguishable from the present case. In Mason the witness was shown only a single mug shot. The court referenced her youth solely to state that she may have been under pressure to make an identification because she was a young and inexperienced teller who was responsible for the loss of a large amount of money. She conceded that despite the unusually large amount of the withdrawal, she neglected to verify the signature; “thus, her prompt identification of the culprit leading to his apprehension could have promised to get her out of some very hot water.” Mason, 414 F.2d at 1182. There was no mention that the witness’s age made her more susceptible to any police techniques.
Although the witness’s age may be a factor in determining credibility and weight of the evidence, it would not effect the admissibility of the witness’s identification. Cf. Alabama G.S.R. Co. v. Hall, 105 Ala. 599, 17 So. 176, 179 (1895) (“The want of experience would go to the weight to be given to the evidence, but not to its admissibility.”).
Moreover, to the extent that Dotch argues that the combination of suggestive techniques used by the police compounded the impact on the reliability of Moore’s identification of Dotch as the perpetrator, none of the techniques were suggestive, and in combination they did not amount to impropriety. See Jackson v. State, 562 So.2d 1378, 1384 (Ala.Crim.App.1990) (holding that none of the questioned aspects of interrogation standing alone mandated a finding of coercion or inducement nor did their cumulative effect). Compare Brazell v. State, 369 So.2d 25, 29 (Ala.Crim.App.1978) (holding that “the totality of the circumstances, the combined and cumulative effect of these factors, the nature of the confrontation itself, the lack of necessity for a showup, the unusual hour, and the distinctive clothing create[d] an unduly suggestive identification procedure”).
Moreover, Moore’s identification was also rehable under the factors set forth in Neil v. Biggers, supra. Moore had the opportunity to view the man in the parking lot as he approached the driver’s side of the vehicle and spoke to the person standing by the vehicle. (R. 157, 181, 182, 185, 722.) She watched him from the drive-through window, which faced the Subway sandwich shop. She saw the other person, who was seated in the vehicle, and then heard three gunshots. (R. 182, 722.) She saw the man run behind the McDonald’s restaurant and watched the vehicle roll backward and hit a truck. (R. 157, 724.) She saw the legs of the person in the vehicle hanging out of the opened door. (R. 724.) She backed away from the drive-through window and informed her manager of what she had seen. (R. 183.) She testified at the pretrial hearing that she only saw him for “[m]aybe a minute.” (R. 184.)[8]
Moore further testified that she was attuned to the events because the man walking across the parking lot caught her at *963 tention. She testified, “I was just — I knew something — I thought something was going to happen.” (R. 181.) Moreover, “[s]he testified lucidly and in great detail as to the course of events that evening.” Hutchinson v. State, 516 So.2d 889, 898 (Ala.Crim.App.1987).
The description she gave the police of the man was also accurate. She described his clothing, his age, his height, race, complexion, and haircut. (R. 157, 722.)
Her identification of Dotch’s photograph as depicting the man whom she had seen was tentative. When the prosecutor asked her, “What does the word ‘tentative’ mean to you?”, she responded, “Which one I think is right.” (R. 727.) She testified that she was not certain that the photograph was of the man that she had seen in the parking lot. (R. 725.)
The photographic array was shown to Moore on the day following the offense. (R. 158, 728, 725.) The back of the array indicates that her identification was entered at approximately 9:40 a.m. (S.R.35.) Therefore, less than 24 hours had passed from the time of the offense. Hutchinson v. State, 516 So.2d at 893 (finding that the factor that “[t]he length of time between the crime and the photographic line-up was less than 24 hours” weighed in favor of an accurate identification).
D.
Each of the witnesses gave reliable identifications under the factors enumerated in Neil v. Biggers, supra. Furthermore, none of Dotch’s allegations of suggestive techniques used by the police is supported by the record. Dotch, however, argues that, because of discrepancies in the descriptions of the man seen in the parking lot by the witnesses, their identifications should be discounted. He refers to Sayer’s and Slack’s descriptions of the man whom they had seen as being dark-skinned, whereas Moore testified that the man had a medium complexion; that Moore guessed that the man’s height was approximately 5'6" to 5'8" (R. 722), while Sayer testified that “if [she] had to guess, somewhere close to six feet” (R. 130) and Slack described the man as being of “middle height.” (R. 707, 708.)[9]
These descriptions do not vary to the extent that they call the reliability of the identifications into question. In Thomas v. State, 399 So.2d 915 (Ala.Crim.App.1981), the witnesses’ descriptions varied from the description of Thomas provided on the lineup sheet, and this court found that the identifications were nonetheless reliable. This court wrote:
“While the descriptions given by the witnesses vary somewhat with the description given on the lineup sheet, they are not so inconsistent that they preclude the possibility of appellant being the person described by the witnesses to the police. The only major discrepancy is [a witness’s] estimation of the suspect’s height as some three or four inches shorter than that of appellant.”
Thomas v. State, 399 So.2d at 920. See Reese v. State, 549 So.2d 148, 154 (Ala.Crim.App.1989), overruled on other grounds, Huntley v. State, 627 So.2d 1013 (Ala.1992) (Reese’s claim that his conviction should be reversed because the victims’ descriptions of the person who assaulted them differed presented a jury question). Cf. Bell v. State, 364 So.2d 420, 423 (Ala.Crim.App.1978) (“The fact that the State’s witnesses described the item taken somewhat differently presented a question for the jury.”).
“ ‘The weight of the evidence, the credibility of the witnesses, and inferences to *964 be drawn from the evidence, where susceptible of more than one rational conclusion, are for the jury alone. Willcutt v. State, 284 Ala. 547, 226 So.2d 328 (1969).’ Walker v. State, 416 So.2d 1083, 1089 (Ala.Cr.App.1982). ‘It was within the province of the jury to give the evidence in the case whatever weight and emphasis they thought proper in reaching their verdict.’ Linson v. State, 394 So.2d 85, 92 (Ala.Cr.App.1981). ‘Where, as in this case, there is conflicting evidence presented by the prosecution and the defense, it is for the jury to resolve the conflict and determine the defendant’s guilt or innocence.... In making its determination,.the jury may believe or disbelieve all or any part of the testimony presented by either side.’ Terry v. State, 424 So.2d 652, 655 (Ala.Cr.App.1982).
“ ‘Conflicting evidence always presents a question for the jury unless the evidence fails to establish a prima facie case. Starling v. State, 398 So.2d 337 (Ala.Cr.App.), cert. denied, Ex parte Starling, 398 So.2d 342 (Ala.1981).’ Gardner v. State, 440 So.2d 1136, 1137 (Ala.Cr.App.1983).”
Mosley v. State, 461 So.2d 34, 36 (Ala.Crim.App.1984).
Furthermore, Dotch contends that Slack and Sayer both gave unreliable identification testimony at trial because they both testified that they saw the man carrying a gun at the time of the offense, while neither had mentioned this fact to the police when she originally gave her statement. However, this matter was for the jury to resolve.
Similarly, in Powell v. State, 600 So.2d 1085 (Ala.Crim.App.1992), an officer described Powell as being 5'4" and weighing 135 pounds, whereas at trial he described Powell as being 5'5" or taller, as being small and having a scar or burn on his neck “a fact not mentioned in his original report.” The officer’s identification, however, was held as not unreliable. Powell v. State, 600 So.2d at 1086. Further, although the officer’s description varied from Powell’s actual appearance of over 5'8" and 162 pounds, the officer’s identification was admissible. “Questions of identity are for the jury to resolve, see Holton v. State, 590 So.2d 914 (Ala.Cr.App.1990), aff'd, 590 So.2d 918 (Ala.1991)....” Id.
Neither the cited discrepancies in the witnesses’ descriptions nor the differences in the descriptions in their original statements and those in their testimony at trial discredited their identifications. The weight to be accorded to this evidence and the resolution of credibility decisions were matters for the finders of fact.
E.
Finally, Slack, Sayer, and Moore each positively identified Dotch in court as the man they had seen in the parking lot at the time of the offense. The initial identification procedure was not unnecessarily or impermissibly suggestive so as to be conducive to irreparable misidentification; thus, the witnesses did not require an independent basis for them identifications of Dotch. The in-court identifications were not a violation of Dotch’s rights to due process. Ex parte Wimes, 14 So.3d 131, 134 (Ala.2009).
II.
Dotch contends that the introduction of prior-bad-act evidence irreparably tainted his trial, in violation of his rights to due process and a fair trial. Specifically, he argues that the introduction of this evidence rendered his trial unfair because, he says, the indictment contained “irrelevant and inflammatory information that prejudiced the jury from the outset” and be *965 cause the State was allowed to improperly introduce this evidence throughout all of the proceedings. (Dotch’s brief, at 44-45.)
A.
Dotch contends that the indictment was overly prejudicial because it referred to his prior convictions. Moreover, he contends that the trial court compounded the error by reading the indictment to the jury.
Dotch failed to object on this ground to the trial court; therefore, this issue is due to be analyzed under the plain-error rule. Rule 45A, Ala.R.App.P. According to this rule, “[i]n all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review ... whenever such error has or probably has adversely affected the substantial right of the appellant.”
“ ‘ “Plain error is defined as error that has ‘adversely affected the substantial right of the appellant.’ ” ’ Ex parte Brown, 11 So.3d 933, 936 (Ala.2008), quoting Hall v. State, 820 So.2d 113, 121 (Ala.Crim.App.1999).
“ ‘ “The standard of review in reviewing a claim under the plain-error doctrine is stricter than the standard used in reviewing an issue that was properly raised in the trial court or on appeal. As the United States Supreme Court stated in United States v. Young, 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), the plain-error doctrine applies only if the error is ‘particularly egregious’ and if it ‘seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.’ See Ex parte Price, 725 So.2d 1063 (Ala.1998), cert. denied, 526 U.S. 1133, 119 S.Ct. 1809, 143 L.Ed.2d 1012 (1999); Burgess v. State, 723 So.2d 742 (Ala.Crim.App.1997), aff'd, 723 So.2d 770 (Ala.1998), cert. denied, 526 U.S. 1052, 119 S.Ct. 1360, 143 L.Ed.2d 521 (1999); Johnson v. State, 620 So.2d 679, 701 (Ala.Crim.App.1992), rev’d on other grounds, 620 So.2d 709 (Ala.1993), on remand, 620 So.2d 714 (Ala.Crim.App.), cert. denied, 510 U.S. 905, 114 S.Ct. 285, 126 L.Ed.2d 235 (1993).”
‘“Hall v. State, 820 So.2d 113, 121-22 (Ala.Crim.App.1999), aff'd, 820 So.2d 152 (Ala.2001). Although the failure to object will not preclude our review, it will weigh against any claim of prejudice. See Dill v. State, 600 So.2d 343 (Ala.Crim.App.1991), aff'd, 600 So.2d 372 (Ala.1992).’ ”
Johnson v. State, [Ms. CR-99-1349, Oct. 2, 2009] — So.3d-,-(Ala.Crim.App.2005) (opinion on remand from the Alabama Supreme Court), quoting Sale v. State, 8 So.3d 330, 345 (Ala.Crim.App.2008), cert. denied, Ex parte Sale, 8 So.3d 352 (Ala.2008), cert. denied, Sale v. Alabama, — U.S.-, 129 S.Ct. 2062, 173 L.Ed.2d 1141 (2009).
Count two of the indictment charged Dotch with violating § 13A-5-40(a)(14), Ala.Code 1975, which designates as capital
“murder when the victim is subpoenaed, or has been subpoenaed, to testify, or the victim had testified, in any preliminary hearing, grand jury proceeding, criminal trial or criminal proceeding of whatever nature, or civil trial or civil proceeding of whatever nature, in any municipal, state, or federal court, when the murder stems from, is caused by, or is related to the capacity or role of the victim as a witness.”
In the present case, count two of the indictment specifically charged that Dotch
“did intentionally cause the death of another person, to-wit: Timarla Taldon, by shooting her with a gun, when the said *966 Timarla Taldon was or had been subpoenaed to testify, or had testified in a criminal trial or criminal proceeding in the case of State of Alabama vs. Garrett Dotch, in the Grand Jury of Mobile County that indicted said defendant for Burglary 1st degree and Assault 3rd degree and/or the case of M-05-05-2768 where the defendant was charged and found guilty of Domestic Violence 3rd degree of Timarla Taldon and the said murder stemmed from, was caused by, or was related to the capacity of the said Timarla Taldon as a witness, in violation of 13A-5-40(a)(14) of the Code of Alabama against the peace and dignity of the state of Alabama.”
Thus, the references to the prior convictions provided the factual basis for the charge as to the criminal proceeding for which the victim, Taldon, was a witness. These facts placed Dotch on notice as to the exact charge so that he could prepare a knowing and adequate defense.[10] “The crucial question, of course, is whether the indictment sufficiently apprises the accused with reasonable certainty of the nature of the accusation made against him so that he may prepare his defense, that he may be protected against a subsequent prosecution for the same offense.” Ex parte Harper, 594 So.2d 1181, 1183 (Ala.1991), cert. denied, Harper v. Alabama, 506 U.S. 918, 113 S.Ct. 330, 121 L.Ed.2d 248 (1992.)
The State was required to prove that Taldon was a witness in a criminal proceeding and that that role spawned her murder. Therefore, the State was required to prove that there was such a criminal proceeding. Thus, this language in the indictment specified the facts that would be proved to fulfill this element of the charged offense. Johnson v. State, [Ms. 1041313, Oct. 6, 2006] — So.3d - , - (Ala.2006), on remand to, Johnson v. State, [Ms. CR-99-1349, October 2, 2009] — So.3d-(Ala.Crim.App.2009) (holding that it was “ ‘highly necessary'” for the State to prove the bigamy conviction against Johnson because the conviction was an essential element of the charge of capital murder of a witness who had testified against her and was thus substantive evidence; further, the other allegations of adultery and bad acts were properly admitted as part of the res gestae of the offense and were therefore substantive evidence).
Because the indictment properly mentioned the prior convictions, the trial court’s instructions to the jury; in which the judge, read the indictment and charged as to the requisite proof of the elements of the charged offenses, were also proper.
B.
Dotch also argues that the prior convictions were inadmissible because, he says, they were irrelevant to the charge under count two of the indictment alleging murder made capital because the victim was a person who has testified in a criminal proceeding and the murder stemmed from, was caused by, or was related to the victim’s role as a witness. He also submits that the prior convictions were not admissible to show motive or intent.
However, as stated in Part H.A., the prior convictions were admissible because the State had to prove that there was a criminal proceeding involving the victim as a witness that had precipitated the murder. Because the prior offenses were properly charged in the indictment *967 as the factual basis of an element of the offense, it was incumbent upon the State to prove them. Further, the convictions were relevant because they were also introduced to prove motive and intent. Johnson v. State, — So.3d at-.
The evidence of Dotch’s prior convictions was relevant to the charge in count two of the present case. As stated in Brown v. State, 56 So.3d 729 (Ala.Crim.App.2009), concerning the relevancy of evidence:
“‘Rule 402, Ala. R. Evid., provides that “[a]ll relevant evidence is admissible, except as otherwise provided by the Constitution of the United States or that of the State of Alabama, by statute, by these rules, or by other rules applicable in the courts of this State.” Rule 401, Ala. R. Evid., defines “relevant evidence” as “evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.” “Alabama recognizes a liberal test of relevancy, which states that evidence is admissible ‘if it has any tendency to lead in logic to make the existence of the fact for which it is offered more or less probable than it would be without the evidence.’” Hayes [v. State], 717 So.2d [30] at 36 [ (Ala.Crim. App 1997) ], quoting C. Gamble, Gamble’s Alabama Evidence § 401(b). “[A] fact is admissible against a relevancy challenge if it has any probative value, however[ ] slight, upon a matter in the case.” Knotts v. State, 686 So.2d 431, 468 (Ala.Crim.App.1995) aff'd, 686 So.2d 486 (Ala.1996). Relevant evidence should be excluded only “if its probative value is substantially outweighed by the danger of unfair prejudice confusion of the issues or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.” Rule 403, Ala. R. Evid. “The general rule is that articles which are properly identified and which tend to show the commission of the crime or the manner in which it was committed or elucidate some matter in issue are admissible in evidence for inspection and observation by the jury.” Beasley v. State, 408 So.2d 173, 179 (Ala.Crim.App.1981).’ ”
Brown v. State, 56 So.3d at 735, quoting Gavin v. State, 891 So.2d 907, 963-64 (Ala.Crim.App.2003).
These convictions were necessary to prove the second count of the indictment and were relevant to Dotch’s motive and intent. Johnson v. State, — So.3d at -.
In Stephens v. State, 982 So.2d 1110 (Ala.Crim.App.2005), reversed on other grounds, 982 So.2d 1148 (Ala.2006), this Court addressed the admission of prior convictions in cases involving domestic abuse or a history of violence for proving motive and intent in a current murder case:
“It has long been the rule in Alabama that former acts of cruelty, hostility, or violence by the accused toward the victim are admissible in order to establish a motive to commit the charged homicide. See, e.g., Bennefield v. State, 281 Ala. 283, 202 So.2d 55 (1967) (evidence of husband’s prior assaults on wife admissible to establish motive in prosecution for murder because acts ‘tended to show ill feeling between the parties’); Patterson v. State, 243 Ala. 21, 8 So.2d 268 (1942) (proof that husband had previously been convicted of assaulting his wife admissible to establish motive in prosecution for murder); Doane v. State, 351 So.2d 648, 653 (Ala.Crim.App.1977) (testimony concerning premarital fight between defendant and victim admissible to establish *968 motive and malice in prosecution for manslaughter). Indeed, Professor Gamble has noted:
“‘One of the most common cases where motive is shown is that where the wife allegedly is murdered by the husband. In these cases a whole host of circumstances, existing between the two parties, are admitted for the purpose of showing that one spouse had a motive for killing the other.
“ ‘Former acts of hostility or cruelty by the accused upon the victim are very commonly the basis for the prosecution’s proof that the accused had a motive to commit the charged homicide.’
“1 C. Gamble, McElroy’s Alabama Evidence § 45.01(8).
“Here, evidence was admitted concerning a history of marital difficulties between Stephens and Annie. As a result, Annie and the couple’s three children had moved out of the marital residence several months earlier and were living with Annie’s father at the time the homicides occurred. Although Annie returned to the couple’s mobile home to do laundry, she did so when Stephens was not present, most likely to avoid a confrontation. Annie’s father testified that in 1992 Stephens had shot Annie following an argument, resulting in his conviction for second-degree assault. During closing argument, the State argued that the evidence demonstrated that Stephens’s motive for killing Annie was in all likelihood rage. Thus, evidence of the 1992 shooting was admitted to support the State’s theory that Stephens had stabbed his wife in a fit of rage, following an argument or some other type of confrontation.
“Evidence of the 1992 conviction was likewise admissible under the intent exception to the general exclusionary rule.
“Addressing the admissibility of collateral-act evidence pursuant to the intent exception, Professor Gamble has written:
“ ‘If the accused is charged with a crime that requires a prerequisite intent, collateral crimes, acts or misconduct are admissible to show that the accused possessed the necessary intent. This rule is based upon the theory that because the unintentional doing of an act is abnormal and unusual, the more a person does other acts similar to the act in question, the greater the likelihood that the act in question was not done inadvertently. Whether the collateral act has a tendency to show that the accused did possess the prerequisite state of mind is, of course, one of relevancy vested largely in the discretion of the trial court.’
“1 C. Gamble, McElroy’s Alabama Evidence § 69.01(5) (footnotes omitted).”
Stephens v. State, 982 So.2d at 1128-29.
Moreover, the relevance of the evidence of these convictions was not outweighed by the evidence of its prejudicial impact. “The State did not use this evidence to confuse the jury, or ‘ “to imply the inference of facts which do not exist,” ’ or ‘ “to bolster a weak case against the defendant.” ’ Blackmon v. State, 7 So.3d 397, 430 (Ala.Crim.App.2005).” Johnson v. State, — So.3d at - .
The trial court did not abuse it’s discretion in determining that this evidence was admissible. Ex parte Loggins, 771 So.2d 1093, 1103 (Ala.2000).
C.
Dotch argues that because the jury acquitted him as to count two of the indictment, which charged that the murder stemmed from or was related to Taldon’s *969 role as a witness in a criminal proceeding, evidence of the prior convictions should not have been admitted. He submits that because the convictions pertained only to this charge and were irrelevant to the capital charge of murdering Taldon by using a deadly weapon while Taldon was in the vehicle, the admission of the evidence of the prior convictions was reversible error.
However, relevance relates to the crime or crimes charged and is evaluated at the time the evidence is sought to be introduced. Here, Dotch was charged with two capital offenses. Although the jury found that the State had failed to prove count two of the indictment, Dotch was validly charged with that crime. Dotch did not move for a severance and does not now argue that the charges should have been severed.[11] He contends that because the State did not present sufficient evidence of count two of the indictment, the admission of evidence of the prior convictions was reversible error.
Furthermore, Dotch did not suffer compelling prejudice by the admission of these collateral acts because they were admissible as motive leading up to the murder, as well as intent. “ “When evidence of a former difficulty between a defendant and the assaulted party is offered by the State, it is for the purpose of shedding light on the true conduct of the defendant at the time of the subsequent difficulty for which the accused is on trial.’ ” Barton v. State, 494 So.2d 948, 952 (Ala.Crim.App.1986) (holding that the victim’s testimony concerning former beatings was not offered for the purpose of showing Barton’s bad character but was admissible as evidence of motive and intent), quoting Thigpen v. State, 50 Ala.App. 176, 277 So.2d 922, 924 (1973). See also Johnson v. State, — So.3d-.
The evidence indicates that Dotch had been terrorizing Taldon for years, culminating in her murder. After their breakup, Taldon attempted to move forward in her life without Dotch. He, however, continued to victimize her until he shot her in the parking lot as she attempted to leave her workplace.
Despite Dotch’s acquittal as to count two, the evidence of the prior convictions was admissible.
III.
Dotch argues that the trial court committed plain error by failing to sua sponte give limiting instructions to the jury concerning its use of the prior-conviction evidence. However, in a similar case, the Alabama Supreme Court has held that such limiting instructions are not necessary because, as in the present case, the prior convictions were being introduced as substantive evidence. Johnson v. State, — So.3d at-.
Although Dotch cites Ex parte Minor, 780 So.2d 796 (Ala.2000), and Snyder v. State, 893 So.2d 482 (Ala.2001), in support of his claim, the Alabama Supreme Court in Johnson v. State, — So.3d at -, distinguished these cases from the present situation, because in those cases, the prior-conviction evidence was being introduced to impeach the defendants’ credibility. In those cases, the prior convictions were not *970 substantive evidence of the offenses. The Court wrote:
“It is contradictory and inconsistent to allow, on the one hand, evidence of Johnson’s prior bigamy conviction and prior bad acts as substantive evidence of the offense with which she was charged, yet, on the other hand, to require a limiting instruction instructing the jury that it cannot consider the evidence as substantive evidence that Johnson committed the charged offense.”
Johnson v. State, — So.3d at-.
Thus, the trial court acted properly in not giving limiting instructions to the jury concerning Dotch’s prior convictions.
IV.
Dotch argues that the trial court improperly prohibited the introduction of evidence of Dotch’s civil commitment, in violation of his rights to due process, a fair trial, and a reliable sentencing. He contends that because he entered a plea of not guilty by reason of mental disease or defect, the trial court abused its discretion by excluding evidence concerning the probate court’s 2003 order of committing Dotch to a mental-health facility. Dotch alleges that this evidence was relevant to his plea and necessary to rebut the State’s prior-conviction evidence.
Dotch specifically argues in his original brief on appeal, firstly, that the trial court erred by referring to an incorrect and outdated legal analysis used by probate courts to determine whether individuals should be committed. He submits that this amounted to an abuse of discretion. He further contends that the two cases cited' by the State in its brief on appeal are based on the old legal basis for determining commitment and are therefore inapposite.
According to § 22-52-10.4(a), Ala.Code 1975, which governs the necessary findings by the court to commit a person to inpatient treatment:
“A respondent may be committed to inpatient treatment if the probate court finds, based upon clear and convincing evidence that: (i) the respondent is mentally ill; (ii) as a result of the mental illness the respondent poses a real and present threat of substantial harm to self and/or others; (iii) the respondent will, if not treated, continue to suffer mental distress and will continue to experience deterioration of the ability to function independently; and (iv) the respondent is unable to make a rational and informed decision as to whether or not treatment for mental illness would be desirable.”
The forerunner to this provision, § 22-52-10(a), Ala.Code 1975, which addressed the findings necessary for involuntary commitment and which was repealed by Act No. 91-440, Ala. Acts 1991, p. 783, § 14, stated:
“(a) If at the final hearing upon a petition seeking to commit a person to the custody of the state department of mental health or such other public facility as the court may order, the probate judge, on the basis of clear, unequivocal and convincing evidence, shall find:
“(1) That the person sought to be committed is mentally ill; and
“(2) That as a consequence of the mental illness the person poses a real and present threat of substantial harm to himself or others; and
“(3) That the threat of substantial harm has been evidenced by a recent overt act; and
“(4) That treatment is available for the person’s mental illness or that confinement is necessary to prevent the person from causing substantial harm to himself or to others; and
*971 “(5) That commitment is the least restrictive alternative necessary and available for treatment of the person’s mental illness.... ”
The determination to be made by a jury in a criminal trial when a defendant enters a plea of not guilty by reason of mental disease or defect is governed by § 13A-3-1, Ala.Code 1975, which states:
“(a) It is an affirmative defense to a prosecution for any crime that, at the time of the commission of the acts constituting the offense, the defendant, as a result of severe mental disease or defect, was unable to appreciate the nature and quality or wrongfulness of his acts. Mental disease or defect does not otherwise constitute a defense.
“(b) ‘Severe mental disease or defect’ does not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct.
“(c) The defendant has the burden of proving the defense of insanity by clear and convincing evidence.”[12]
See Ivery v. State, 686 So.2d 495, 500-02 (Ala.Crim.App.1996), opinion after remand, 686 So.2d 520 (Ala.Crim.App.1996) (analyzing the meaning of and proof necessary to establish “wrongfulness” as that term is applied to criminal insanity). The commentary to § 13A-3-1 explains:
“The law in Alabama on insanity as a defense in a criminal case has been well recognized:
“‘Under a plea of not guilty by reason of insanity, the burden is on the defendant to clearly prove to the reasonable satisfaction of the jury that he was so affected by disease of the brain when the offense was committed as to render him so insane that he did not know right from wrong with respect to the particular offense charged, or by reason of such mental disease he could not resist doing the wrong; and the crime must have been the product solely of such diseased mind.’ Streeter v. State, 278 Ala. 272, 177 So.2d 826 (1965); Aaron v. State, 271 Ala. 70, 122 So.2d 360 (1960); Lee v. State, 265 Ala. 623, 93 So.2d 757 (1957); Lakey v. State, 258 Ala. 116, 61 So.2d 117 (1952) and cases cited; Parsons v. State, 81 Ala. 577, 2 So. 854 (1886).”
Section 15-16-2, Ala.Code 1975, requires that “[t]he defense of insanity in all criminal prosecutions shall be clearly proved to the reasonable satisfaction of the jury.”
The determination and analysis when deciding whether a person is so insane that he can be committed on a judge’s order, differ from that of the determination and analysis when deciding whether a person has met his burden of proving that he is not guilty of a crime by reason of mental disease or defect. Because the questions to be asked in determining if someone should be committed are different from the questions to be asked in determining mental disease or defect as an affirmative criminal defense, the probate judge’s order was based on a different standard in evaluating Dotch’s mental state. Such a distinction may cause jury confusion and misunderstanding. The trial court in the present case therefore stated:
“The Court:... .1 think the standard the Probate Court looks at is because of *972 some mental condition, the person before the court poses a real and present danger to themselves or others and are in need of medical attention. They may call that insane. They may call it something else. Of course, what we deal with here is whether the Defendant — or the jury believes, because of a severe mental illness or defect, the Defendant was unable to appreciate the nature and quality of his acts or was unable to appreciate the wrongfulness of his acts. I’m just not sure that the adjudication in Probate Court is focused on the same legal standard as we are here. What I was thinking to say is that I think it would be improper to infer or argue to the jury that this man’s insanity or mental — severe mental disease or defect has been determined by another court for several reasons. One is, again, I’m not sure the same legal standard is being applied. And secondly, I think the testimony here has to be that he suffered that condition at or about the time of the commission of this offense. And he was, obviously, released from Searcy Hospital, so somebody found he had overcome whatever defects he was suffering from. S, I don’t know that it’s relevant.”
(R. 911-12.)
The trial court later stated:
“[I]t would be, I think, improper to have this jury infer that the issue of his ‘sanity has already been decided by a court of competent jurisdiction because no matter what was decided in Probate Court, at that point in time, first of all, you, this morning, probably educated me as to the new procedures and due process requirements of Probate Court and the adversarial nature of all of that.
“But getting beyond that, I don’t — I don’t think the Probate Court reads the pattern jury instruction on mental disease or defect, which is an excuse for criminal conduct, and applies that standard, which is the standard this jury has got to apply, before [it] involuntarily commit[s] somebody.”
(R. 1016.)
Thus, the trial court found that, not only did the inquiries and determinations by the probate court and the jury differ, but the time period pertinent to the evaluation also differed. The commitment proceedings addressed Dotch’s mental state before the hearing; after treatment he was found to be sane enough for release. Here, the pertinent period surrounds the commission of the offense, which was long after his release.
Whether the trial court gleaned the probate court’s determination to have been made pursuant to § 22-52-10, Ala.Code 1975, which was repealed, or the current law, § 22-52-10.4(a), Ala.Code 1975, the judge correctly stated that neither statutory analysis mirrors the present inquiry and therefore could confuse the jury. This is more so because a judge’s order, which might carry a presumption of correctness to a jury, was involved. Cf. generally, Lanzi v. Alabama Dep’t of Revenue, 968 So.2d 18, 21 (Ala.Civ.App.2006) (holding that because a reviewing circuit court applies different standards from an appellate court when reviewing an administrative law judge’s order, no presumption of correctness applies).
Because neither of the statutes concerning commitment was relevant to the present case, the trial court did not err by alluding to the repealed analysis. Rule 45, Ala.R.App.P. (“No judgment may be reversed or set aside, nor new trial granted ... on the ground of misdirection of the jury ... unless in the opinion of the court to which the appeal is taken ... after an examination of the entire cause, it should appear that the error complained of has probably injuriously affected substantial *973 rights of the parties.”). See generally, Lewis v. State, 889 So.2d 623, 693-94 (Ala.Crim.App.2003) (despite Lewis’s contention that the trial court erroneously applied the standard of legal insanity in determining whether his history of mental illness constituted mitigating evidence, the judge’s finding that Lewis was aware of the wrongfulness of his actions was merely a statement in his determination that the evidence of mental illness was unpersuasive and was not applied in his consideration of mitigating evidence).
Dotch further argues that the trial court abused its discretion by excluding the probate court’s order of commitment because “[ejvidence of the probate court materials were relevant to [his] mental health history.” (Dotch’s brief, at 75.)
However, the trial court agreed that evidence of Dotch’s commitment (other than the probate court’s order) and the medical evaluations and treatments relative to the commitment were relevant and admissible. The record indicates that these materials were allowed into evidence at trial. When granting the state’s motion in limine to prevent the defense from introducing any evidence of the probate court’s proceedings, the trial judge stated:
“THE COURT: Now, let me say this: I’m not — By making this ruling on the State’s motion in limine, I’m not saying that his prior mental condition could not be considered by and, perhaps, testified about by a medical — a mental health expert who may come to testify. He may say I’ve looked at his history of illnesses, I’ve looked at his condition and, you know, in support of a diagnosis that at the relevant time and place, he suffered from this condition. So, I don’t think I can exclude the fact that he was hospitalized, but I’m more concerned about trying to infer that the issue has already been decided—
“[Defense counsel]: Your Honor—
“THE COURT: — if that made any sense.”
(R. 913.)
The court thereafter stated:
“Now, turning our attention to your motion in limine, I agree with the State’s position that the Defendant will be instructed and the Defendant is instructed in his questioning of witnesses and in his closing arguments or any other comments that the Defendant is not to make any reference to the court proceedings in the Probate Court as it related to the commitment of the Defendant to a state mental hospital. That’s a court proceeding that I don’t think is relevant to the issues to be decided by this jury.
“I am not, however, stating that the fact that he was at one time committed to or a patient in a state hospital would not, perhaps — I don’t know what the testimony is going to be. It may be relevant as to his background, particularly if Dr. Van Rosen or whomever else testifies that he looked at all of these documents and he saw documents from Searcy Hospital and that has some bearing on his ultimate opinions that he offers in this case.
“So, I’m not saying you can’t talk about Searcy or that he was there or when he was there but as far as that a probate judge made a judicial determination is what I’m restricting you from talking about.”
(R. 1014-15.)
Thus, Dotch was allowed to introduce evidence that he had been committed to Searcy Mental Facility (R. 1018) and that he had received treatment there. He was also allowed to introduce medical records pertaining to his commitment. Although the probate judge’s order was relevant by definition to the issue whether Dotch suf *974 fered from a mental disease or defect, the exclusion of relevant evidence does not always result in reversible error. The order was cumulative of other evidence of Dotch’s commitment and medical diagnoses, treatments, and reports.
The discretion to determine the relevancy of evidence is properly vested in the trial court and “an appellate court ought ... to [only] correct a plainly prejudicial misuse of discretion by the trial court.” C. Gamble, McElroy’s Alabama Evidence § 21.01(6) (4th ed.1991).
“Rule 408, Ala. R. Evid., provides:
“‘Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.’
“See also Houston v. State, 565 So.2d 277, 281 (Ala.Crim.App.1990) (holding that ‘[t]he exclusion of admissible evidence does not constitute reversible error where the evidence “would have been merely cumulative of other evidence of the same nature, which was admitted.” ’). In this case, much of the information that was included in the excluded documentation was not relevant and could have resulted in a confusion of the issues for the jury. Also, the information that was relevant was merely cumulative to testimony ... that had not been disputed by the State.”
Newton v. State, [Ms. CR-05-1517, October 2, 2009] — So.3d —, — (Ala.Crim.App.2009).
As this Court stated in Beckworth v. State, 946 So.2d 490 (Ala.Crim.App.2005), cert. denied, Beckworth v. Alabama, 549 U.S. 1120, 127 S.Ct. 936, 166 L.Ed.2d 717(2007):
“ ‘Furthermore, even if the trial court’s ruling was erroneous, we do not believe the error injuriously affected the substantial rights of this appellant. Matters in the excluded records pertaining to the appellant’s home and family were admitted in evidence through other records and through the testimony of numerous witnesses, thus making the evidence in the excluded records cumulative. The appellant’s sister testified at the sentencing hearing about the home and family life of the appellant. Thus, if error occurred, at all, it was harmless. See Ala.R.App.P. 45; McMahon v. State, 560 So.2d 1094 (Ala.Cr.App.1989).’
“[Knotts v. State, 686 So.2d 481, 444 (Ala.Crim.App.1995)]. See also Ex parte Hodges, 856 So.2d 936, 945-48 (Ala.2003) (testimony about defendant’s unstable home environment was relevant, but no reversible error occurred when prosecutor’s objections to testimony were sustained because the defendant was able to present most of the evidence through later testimony); Windsor v. State, 683 So.2d 1027, 1038-39 (Ala.Crim.App.1994), aff'd, 683 So.2d 1042 (Ala.1996) (trial court erred in excluding hearsay evidence, but no reversal due because similar evidence was presented in later testimony). ”
946 So.2d at 505-06.
Although the probate court’s order was relevant to Dotch’s plea of not guilty by reason of mental disease or defect, the admission into evidence of the order may have caused confusion of the issues, may have been misleading to the jury, and was cumulative of other evidence concerning Dotch’s commitment and mental-health history. Because its probative value did not outweigh its potential prejudicial effects, the trial court did not abuse its discretion so as to plainly prejudice Dotch.
*975 Finally, Dotch argues that the State opened the door to the admission of the probate court’s order of commitment by introducing evidence of the prior convictions that precipitated the order. Dotch contends that the State introduced these convictions to prove Dotch’s sanity at the time that the offenses underlying those convictions were committed, thereby rebutting Dotch’s insanity defense.
As previously held, the State properly introduced evidence of the prior convictions to satisfy its burden of proving § 13A-5-40(a)(14), Ala.Code 1975, and as motive of and intent in the victim’s murder. See Part II.B. and C. The prior convictions were introduced as substantive evidence of the stated charged offense. They were also introduced to show motive as a result of the breakdown of Dotch and the victim’s relationship. They further showed intent by indicating that the murder was not inadvertent. Any light shed as to Doteh’s mental state at the time of the commission of these offenses was incidental. “[E]videnee of separate crimes is admissible if it tends to prove guilt of the crime for which the defendant is being tried and such ‘ “evidence is relevant and competent [and] it should be admitted regardless of its incidental effect.” ’ Weeks v. State, 456 So.2d 395, 399-400 (Ala.Cr.App.1983), affirmed, 456 So.2d 404 (Ala.1984), cert. denied, 471 U.S. 1030, 105 S.Ct. 2051, 85 L.Ed.2d 324 (1985); C. Gamble, McElroy’s Alabama Evidence, § 69.01(1) (3rd ed.1977).” Haywood v. State, 501 So.2d 515, 519 (Ala.Crim.App.1986).
“ ‘All evidence is relevant which throws, or tends to throw, any light upon the guilt or innocence of the prisoner. And relevant evidence which is introduced to prove any material fact ought not to be rejected merely because it proves, or tends to prove that at some other time or at the same time the accused has been guilty of some other separate, independent and dissimilar crime. The general rule is well settled that all evidence must be relevant. If the evidence is relevant upon the general issue of guilt, or innocence, no valid reason exists for its rejection merely because it may prove, or may tend to prove, that the accused committed some other crime or may establish some collateral and unrelated fact.’ ”
Weeks v. State, 456 So.2d 395, 400 (Ala.Crim.App.1983), affirmed, 456 So.2d 404 (Ala.1984), cert. denied, 471 U.S. 1030, 105 S.Ct. 2051, 85 L.Ed.2d 324 (1985).
Although the prosecutor stated in a pretrial hearing that the prior convictions were admissible to rebut the mental disease-or-defect defense, her arguments to the jury concerning the admission of evidence of the convictions were directed at the purposes of proving § 13A-5-40(a)(14), Ala.Code 1975, and proving Dotch’s motive and intent for the murder. Thus, although the evidence of the prior convictions may have also shed light on Dotch’s mental state at that time, that was an ancillary effect. Therefore, the State did not open the door to the admission of the order to rebut the possibility of this incidental effect. Compare Ex parte Drinkard, 777 So.2d 295, 302 (Ala.2000) (where the State introduced part of a statement, Drinkard was allowed to introduce the rest of the statement and, although it referenced a collateral crime, the State could not introduce evidence of the collateral offense under the posture that Drinkard opened the door to its admission). Compare also Ex parte Brownfield, 44 So.3d 43 (Ala.2009) (Brownfield did not open the door for the State to introduce statements he made during a mental evaluation that would otherwise be inadmissible simply because Brownfield had introduced evidence of his mental state at the time of the offense and *976 had entered a plea of not guilty by reason of mental disease).
A party does not ordinarily open the door to the introduction of rebuttal evidence to disprove a matter that was not the apparent and argued intent for the introduction of the original evidence. Here, the intent of the State’s introduction of this evidence was to satisfy its burden of proof of the capital offense, § 13A-5-40(a)(14), Ala.Code 1975, and to prove intent and motive; therefore, Dotch was properly not allowed to introduce the probate court’s order of commitment to prove his mental illness at the time of the prior offenses.
Furthermore, as previously stated, because Dotch was allowed to introduce evidence that he was committed to Searcy Mental Facility following the offenses, and his evaluations and treatment were also admitted, any error in failing to allow the probate court’s order into evidence did not injuriously effect his substantial rights. Rule 45, Ala.R.App.P.
V.
Dotch argues that the verdict forms given the jury and the related instructions were erroneous and invited juror confusion. Specifically, Dotch argues that the trial court improperly provided the jury with a separate form for a verdict of not guilty by reason of mental disease or defect and caused the jury to disregard this verdict by giving them incorrect instructions.
Dotch failed to object to the verdict forms or the trial court’s original charge to the jury concerning its use of the verdict forms. However, defense counsel objected following the trial court’s instructions given to the jury in response to its question during deliberations as to the verdict forms.
The record indicates that the trial court determined that the verdict of not guilty by reason of mental disease or defect should be presented to the jury on a separate form in order to avoid a split verdict. The following transpired at trial:
“THE COURT: And then the verdict — How would you think, that it would be on Count One, guilty, not guilty or not guilty by reason of mental disease or defect? And on the second verdict form, guilty, not guilty or not guilty by reason of mental disease or defect, et cetera?
“[Defense counsel]: I think that follows up the charge we had—
“THE COURT: It seems to me at the time in question, if he’s not guilty by reason of mental disease or defect, he’s not guilty as to any of them. So, I don’t know if you could have just one form that we find the defendant—
“[Prosecutor]: Yeah, I would think you would have to have one form not guilty by reason of mental disease or defect because what if they—
“THE COURT: Split—
“[Prosecutoi*]: Yeah, you don’t want inconsistent verdicts.
“THE COURT: Maybe you’re right. I’ll explain that to the jury.
“[Defense counsel]: That’s fine.”
(R. 1325-26.)[13]
Dotch argues that the verdict form deviated from the Alabama Pattern Jury In *977 structions and that it confused the jury. He argues that the trial court also deviated from the pattern jury instructions in its charge to the jury concerning its use of the verdict forms. The record indicates that the trial court first charged the jury as to its process in arriving at a proper verdict. The court instructed that the jury should first consider the charges in the indictment, then if the jury found Dotch not guilty as to these offenses, it was to consider the lesser-included offense of murder. If it found Dotch not guilty of murder, then the trial court charged that the jury should consider reckless manslaughter. The trial court next charged the jury concerning Dotch’s special plea of not guilty by reason of mental disease or defect. The trial court further charged that if the jury found Dotch guilty of the offense or offenses charged in the indictment or a lesser-included offense, then it should consider Dotch’s special plea and whether he “was suffering from a severe mental disease or defect of the mind which caused him to be unable to appreciate the nature and quality or wrongfulness of his acts....” (R. 1404-05.)
The trial court thereafter instructed the jury concerning the verdict forms, and it stated that the jury was to determine guilt as to the capital offenses, then if the jury found Dotch not guilty as to those offenses, it was to consider the lesser-included offenses. The trial court further charged that, if the jury found Dotch guilty of any of the possible offenses, it should then consider a verdict of not guilty by reason of mental disease or defect. (R. 1417-20.)
Later, during deliberations, the jury submitted a question to the trial court, which Dotch contends evidences the jury’s confusion. The following transpired at trial:
“THE COURT: All right. Y’all have a seat, please. I’ve been handed a note which says, ‘Do we need to come up with a verdict on both counts of capital murder? In other words, do both forms need to be filled out?’ And the answer is yes. As I’ve said earlier today, the jury is to consider all the evidence, and if you are convinced beyond a reasonable doubt that the State has met that burden of proof, then it would be your duty to find the Defendant guilty of that count. The other side of the coin is, of course, on either or both counts, you are not satisfied beyond a reasonable doubt, then you would find the Defendant not guilty. So, you can have a guilty on both counts of the indictment, not guilty on both counts of the indictment, or guilty on one count and not guilty on the other count, but one of them cannot be left blank. Makes sense, I hope.”
(R. 1425-26.)
The trial court asked if the parties had any exceptions to this instruction to the jury. Defense counsel responded that the jury did not mention to which verdict form it was referring and the trial court failed to mention the verdict form for not guilty by reason of mental disease or defect. (R. 1426.) The trial judge stated that he “just responded to the question. The question asked, concerning the capital murder, do we need to fill out both forms.” (R. 1426.) Defense counsel stated that the not-guilty-by-reason-of-mental-disease-or-defect form should be included, and he requested its inclusion in the charge to the jury. The trial court responded, “I think that’s really beyond the question they asked.” (R. 1427.)
The propriety of the verdict forms, the trial court’s initial charge concerning the verdict, and the trial court’s instructions in response to the jury’s question submitted during deliberations will each be discussed.
*978 A.
There is no law in Alabama requiring that the jury be provided with verdict forms of not guilty by reason of mental disease or defect as to each charged offense or that this verdict be contained on the same form as the charged offense. Compare People v. Rhoads, 73 Ill.App.3d 288, 315, 29 Ill.Dec. 249, 391 N.E.2d 512, 531-32 (1979) (holding that although an Illinois statute required that the jury be provided with not-guilty-by-reason-of-insanity verdict form for each charged offense, Rhoads had waived this issue by failing to object and the error was harmless because the charged offenses arose out of the same act so that “the possibility would be slim” that the jury would find him insane as to only one of the offenses).
Pursuant to Rule 23.2(b), Ala.R.Crim.P., “[w]hen the jury determines that the defendant is not guilty by reason of mental disease or defect, the verdict shall so state.” Moreover, “[a] plea of insanity shall not preclude the usual plea of the general issue, which shall not put into question the issue of the irresponsibility of the accused by reason of his alleged insanity, this question being triable only under the special plea.” § 15-16-1, Ala.Code 1975.
As to verdict forms, Rule 23.3, Ala. R.Crim.P., requires that “[f]orms of verdict shall be submitted to the jury for each offense charged and, where warranted by the evidence, for all offenses necessarily included in each offense charged.” The trial court has the authority under this rule to correct or to complete the verdict as to form in open court. There is no requirement that a verdict of not guilty by reason of mental disease, where pleaded, be included on the separate verdict forms for charged or included offenses. Thus, in the present case, the trial court did not err in submitting only one not-guilty-by-reason-of-mental-disease-or-defect verdict form to the jury.
B.
Moreover, the trial court’s instructions were not incorrect and did not confuse or mislead the jury. The judge’s original instructions concerning the jury’s use of the verdict forms were correct. As the court stated, the jury should first determine guilt as to the offenses, and if it found Dotch guilty, then the jury was to determine whether Dotch was not guilty by reason of mental disease or defect.
According to § 15-16-24, Ala.Code 1975:
“If it shall appear from the evidence that a defendant did the act charged as constituting the offense, but at the time of committing the act he was insane, the jury shall render a special verdict to the effect that the defendant is not guilty by reason of insanity, but if the jury does not believe from the evidence that the defendant committed the act or if it believes from the evidence that he is not guilty upon any ground other than his alleged insanity, it must return a general verdict of not guilty; otherwise, it must return a verdict of conviction.”
The trial court’s original instructions substantially followed the Alabama Pattern Jury Instructions. See Alabama Pattern Jury Instructions: Criminal 1.9 (3d ed. 1994) (“[I]f you find that the State has proved beyond a reasonable doubt each of the elements of the offense charged, then you must go further and consider the defendant’s defense that he nevertheless is not criminally responsible as a result of a severe mental disease or defect.”). “The appellate courts of this state endorse the use of the Alabama Pattern Jury Instructions in criminal cases.” Ex parte McGriff, 908 So.2d 1024, 1033 (Ala.2004). See also Ziegler v. State, 886 So.2d 127, *979 145 n. 7 (Ala.Crim.App.2003), cert. denied, 543 U.S. 863, 125 S.Ct. 194, 160 L.Ed.2d 106 (2004) (“We encourage trial courts to use the Alabama Pattern Jury Instructions-Criminal adopted by the Alabama Supreme Court for use in capital cases.”); Wesley v. State, 575 So.2d 108, 116 (Ala.Crim.App.1989), reversed on other grounds, 575 So.2d 127 (Ala.1990) (jury charge that Wesley was presumed sane, which “substantially track[ed] the language found in Alabama Pattern Jury Instructions, Criminal, IIID-2 (1980),” was proper).
Dotch cites two sentences by the trial court during these instructions that he claims confused the jury. After the trial court charged the jury that it should first consider the charged offenses, it stated, “If you find guilt on one or both of those offenses, that will be your verdict. That will be it. You stop there.” (R. 1398; emphasis added.) The court, however, gave the following charge immediately after, “If you find the State has failed to prove beyond a reasonable doubt the elements of both of those charges, then you’ll go to the first lesser included of murder, which I’ve just charged you.” (R. 1398.)
Dotch has pulled the two emphasized sentences out of context. The trial court sequentially instructed the jury as to its duty in arriving at its verdict, including its consideration of Dotch’s special plea if the jury were to find him guilty of a charged or a lesser-included offense.
“ ‘A trial court has broad discretion when formulating its jury instructions. See Williams v. State, 611 So.2d 1119, 1123 (Ala.Cr.App.1992). When reviewing a trial court’s instructions, “ ‘the court’s charge must be taken as a whole, and the portions challenged are not to be isolated therefrom or taken out of context, but rather considered together.’ ” Self v. State, 620 So.2d 110, 113 (Ala.Cr.App.1992) (quoting Porter v. State, 520 So.2d 235, 237 (Ala.Cr.App.1987)); see also Beard v. State, 612 So.2d 1335 (Ala.Cr.App.1992); Alexander v. State, 601 So.2d 1130 (Ala.Cr.App.1992).’
“Williams v. State, 795 So.2d 753, 780 (Ala.Crim.App.1999).”
Robitaille v. State, 971 So.2d 43, 74 (Ala.Crim.App.2005), cert. denied, 552 U.S. 990, 128 S.Ct. 490, 169 L.Ed.2d 339 (2007).
C.
As to the charge given the jury in response to its question posed during deliberations, the trial judge stated that his instruction in response was formulated so as to be strictly confined to the precise question asked. The question asked by the jury was: “Do we need to come up with a verdict on both counts of capital murder? In other words, do both forms need to be filled out?” The trial judge properly responded in the affirmative and explained that the verdict forms as to each count had to be completed to indicate whether the jury found Dotch guilty or not guilty as to each count. He had already instructed the jury that the special plea would be considered if the jury entered a verdict finding Dotch guilty in any charge. The jury’s question did not address that matter.
The trial court properly informed the jury that the jury must first determine guilt as to each offense charged in the indictment. As to the required marking of the verdict forms, Rule 23.2, Ala.R.Crim. P., addresses the necessity for verdict forms, and the commentary thereto states that “[t]he rule places on the court the responsibility of deciding what verdicts the jury may return, restricting the jury to returning verdicts for which verdict forms have been submitted to it.” There is no requirement that each form must be *980 marked if the jury finds that the defendant is not guilty of one offense or as to the exact structure, design, or layout of the verdict forms. See Beasley v. State, 269 Ga. 620, 628, 502 S.E.2d 235, 239 (1998) (finding no error when “the verdict form contained nothing more than a blank space underneath each charge, and the jurors were to specify in those spaces whether Beasley was guilty or not guilty of each charge.”).
Because the trial court properly and clearly informed the jury of its duty in reaching its verdict or verdicts, the trial court did not abuse its discretion and there was no error here.
“ ‘ “The trial court is vested with broad discretion in formulating its charge, so long as it accurately reflects the law.” ’ Powers v. State, 963 So.2d 679, 691 (Ala.Crim.App.2006), (quoting Clark v. State, 621 So.2d 309, 324 (Ala.Crim.App.1992)). See also Williams v. State, 795 So.2d 753, 780 (Ala.Crim.App.1999). ‘When reviewing a trial court’s jury instructions, we must view them as a whole, not in bits and pieces, and as a reasonable juror would have interpreted them. Ingram v. State, 779 So.2d 1225 (Ala.Cr.App.1999).’ Johnson v. State, 820 So.2d 842, 874 (Ala.Crim.App.2000).”
Marshall v. State, 20 So.3d 830, 836 (Ala.Crim.App.2008), cert. denied, — U.S. —, 130 S.Ct. 635, 175 L.Ed.2d 488 (2009).
Further, Dotch suffered no prejudice as to the form of the verdicts. See State v. Huth, 334 N.W.2d 485, 491 (S.D.1983)(five verdict forms, including three guilty forms as to three offenses, a not-guilty form, and a not guilty by reason of mental illness form, “were proper and adequate when considered with the instructions to the jury as a whole and the testimony presented during the trial”).
VI.
Dotch argues that the State violated the holding in Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), by improperly striking African-American veniremembers. Specifically, Dotch submits that the record raises an inference that the State engaged in purposeful discrimination because the State struck 10 of the 14 African-American potential jurors while defense counsel did not strike any African-American potential jurors. The jury consisted of eight white and four African-American jurors.
However, the record reveals that Dotch raises this issue for the first time on appeal. Rule 45A, Ala.R.App.P. At trial, he failed to object to the strikes by the prosecutor on the ground of racial bias; he did not establish a prima facie case of discrimination; and he did not request that the prosecutor come forward with reasons for her strikes.
“ ““ “For plain error to exist in the Batson context, the record must raise an inference that the state [or the defendant] engaged in ‘purposeful discrimination’ in the exercise of its peremptory challenges. See Ex parte Watkins, 509 So.2d 1074 (Ala.), cert. denied, 484 U.S. 918, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987).” ’ ”
“ ‘Smith v. State, 756 So.2d 892, 915 (Ala.Crim.App.1998), aff'd, 756 So.2d 957 (Ala.2000) (quoting Rieber v. State, 663 So.2d 985, 991 (Ala.Crim.App.1994), quoting in turn other cases).’
“Ex parte Walker, 972 So.2d [737] at 742 [(Ala.2007)].”
Ex parte Sharp, [Ms. 1080959, December 4, 2009] — So.3d — (Ala.2009).
A.
Dotch argues that the record presents an inference of discrimination on the part *981 of the State because it used three of its strikes to remove African-American potential jurors although white potential jurors with the same characteristics or who answered questions similarly were not removed.
He first cites one potential African-American juror who he alleges had the same characteristics as a white juror who was not struck by the State; specifically, he was married, worked in the medical field, and recognized some of the potential witnesses. However, unlike the white potential juror who Dotch says shares similar characteristics, the African-American veniremember worked at Searcy Mental Facility, where Dotch had been treated, and worked with two of the State’s witnesses—a police officer and a psychiatrist. She stated that the psychiatrist was a supervisor at her workplace. (R. 408-10.) She stated that he was not her immediate supervisor but that he could write a letter of recommendation or reprimand concerning her. (R. 409.) The record indicates that the prosecutor also removed a white potential juror who had a friend who worked at Searcy Medical Facility. (R. 466.)
The second African-American cited for disparate treatment was born in the same year as a white veniremember, who also retired from one job but continued to work. However, the State in its brief responds to this claim by noting that the struck juror’s professional background was as an educator and counselor, as opposed to the white potential juror who had worked for a paper company. The State submits that, because the death penalty was being sought, a counselor and educator might be more inclined to rehabilitation.
This reason has been held to be invalid as a race-neutral reason for striking. Although the fact that a veniremember is a teacher or college counselor alone has been held to be an insufficient reason for striking a potential juror, see Williams v. State, 548 So.2d 501, 506 (Ala.Crim.App.1988), cert. denied, 489 U.S. 1028, 109 S.Ct. 1159, 103 L.Ed.2d 218 (1989) (college counselors); McGahee v. State, 554 So.2d 454, 461 (Ala.Crim.App.1989), affirmed, 554 So.2d 473 (Ala.1989), after remand, 632 So.2d 976 (Ala.Crim.App.1993), affirmed, 632 So.2d 981 (Ala.1993), cert. denied, 514 U.S. 1078, 115 S.Ct. 1726, 131 L.Ed.2d 583 (1995) (teachers), in some cases these may be sufficient reasons. Assumptions about professions without more is suspect; however, where white veniremembers were struck for the same reasons, there is no disparate treatment and the reasons can be validly race neutral. Here, the prosecutor also struck a white potential juror who worked with Good Will Easter Seals and another white potential juror who had worked with the Mobile Association for Retarded Citizens for 10 years. (R. 467, SSR.33, 34.) The prosecutor also struck a white potential juror who worked for Mid-South Home Care (SSR.34) and a white veniremember who worked as an admissions recruiter for the Alabama School of Math and Sciences. (R. 267, 628.)
Moreover, this veniremember stated in her jury questionnaire that her graduate studies required readings in psychiatry, psychology, and mental health or retardation; she also stated that she was interested in these studies. Because Dotch raised the affirmative defense of not guilty by reason of mental disease or defect, the veniremember’s outside studies may have interfered with her objectivity.
As to the last strike of an African-American potential juror cited by Dotch, he argues that this veniremember, like another white veniremember who was not struck by the State, was married, worked *982 for Mobile County, and remembered a few details of the offense from the media. However, the African-American venire-member stated that she worked for the Mobile County Health Department,[14] which, as a result of Dotch’s special plea, might have influenced her in deciding this case. The white veniremember worked for the Revenue Commissioner’s Office. Moreover, as previously stated, the prosecutor also struck white veniremembers who worked for health-care establishments, specifically, the Mobile Association for Retarded Citizens and MidSouth Home Care. Thus, the record provides nonracial reasons for these strikes.
B.
Dotch also alleges that the State engaged in a pattern of striking African-American veniremembers that indicated racial bias; however, he refers only to the percentage of potential African-American jurors struck by the State and the percentage of the State’s strikes used to eliminate African-American potential jurors. Moreover, as Dotch notes in brief, before the removal of veniremembers for cause, there were 57 whites and 18 African-Americans on the original panel of 75, 76 percent and 24 percent, respectively. However, the jury consisted of 8 whites and 4 African-Americans, 67 percent and 83 percent, respectively, so that the percentage of African-Americans on the jury was actually higher than the percentage of African-Americans on the venire.
C.
Dotch further submits that the Mobile district attorney’s office has a long history of Batson violations, although this was not reflected in, or indicated by, the record. See Sharifi v. State, 993 So.2d 907, 928 (Ala.Crim.App.2008) (no inference from the record of discriminatory use of peremptory challenges by the prosecutor despite Sharifi’s argument that Madison County has a long history of violating Bat-son and that the number of strikes used by the State indicated prejudice). Further, in its brief on appeal, the State argues that none of the cases cited by Dotch as indicating a history of discrimination occurred within the last decade or involved the prosecutor in Dotch’s case. (State’s brief, at 69.)
D.
Dotch also contends that prejudice is indicated because the 10 African-Americans struck by the State were heterogeneous; 4 were men and 6 were women. However, varying gender alone does not indicate that race was the reason for the strikes. There is no argument that these potential jurors were in all other respects as heterogeneous as the community as a whole. Ex parte Branch, 526 So.2d 609, 622 (Ala.1987).
E.
Finally, Dotch contends that four of the African-American veniremembers removed by the State did not make any response during voir dire that would provide a basis for being struck. However, two of those jurors were the same jurors Dotch argued had been removed by disparate treatment: one who worked for the Mobile County Health Department and one who had worked as a counselor and educator through the Boys and Girls Club of America. Compare Brown v. State, 982 So.2d 565, 586 (Ala.Crim.App.2006), cert. denied, 552 U.S. 1321, 128 S.Ct. 1893, 170 L.Ed.2d 763 (2008) (strike of potential ju *983 ror who had a nephew and grandson with mental problems held to be race neutral where Brown had been treated for mental disease); Bass v. State, 585 So.2d 225, 237 (Ala.Crim.App.1991) (upholding the trial court’s decision that the striking nurse because she had relatives who had suffered a nervous breakdown was a race-neutral reason under the circumstances of the particular case). Moreover, as previously stated, white potential jurors were struck for the same or similar reasons as these two African-American veniremembers. Thus, there was no disparate treatment or indication that the strikes were based on race.
As to another potential juror struck by the State, he argues that the record reveals only that she was employed as a maintenance worker at University of South Alabama. However, she responded to questioning that she and another potential juror knew each other, and the record shows that the other veniremember, who was white,[15] was also struck by the prosecutor.[16] (R. 508.)
Dotch also cites the prosecutor’s striking of a potential juror the strike list shows to have been the oldest juror at 74 years old. Although age alone as a reason for striking may be suspect, it also may be sufficient to overcome a challenge under Batson, when coupled with other factors indicating difficulty in serving as a juror. Moreover, where white jurors were also struck because of age, there is an indication of a lack of racial motivation behind the strike. Here the record shows that other elder veniremembers (both white, a male and a female aged 71 and 73, respectively) were also struck by the prosecutor. Although one veniremember who was a 73-year-old white female was removed by Dotch, he used his first strike to do so.
Moreover, the record indicates that this potential juror was called before the judge and parties for individual questioning because she had failed to sign the juror questionnaire. (R. 448.) She stated that she forgot to do so, and the prosecutor asked if she had received any help in filling out the questionnaire; she responded that she had not. (R. 448.) Thereafter, the prosecutor questioned this potential juror as follows:
“[Prosecutor]: Okay. You put a bunch of X’s. Does that mean you have — you don’t have an answer to those questions or did you have trouble reading the questions or—
“[Potential juror]: Yes, ma’am.
“[Prosecutor]: Did you have any trouble reading any of the questions?
“[Potential juror]: I did not.”
(R. 449.)
It is clear from her questioning that the prosecutor believed that this potential juror might have trouble serving on the jury. See Acklin v. State, 790 So.2d 975, 988-89 (Ala.Crim.App.2000), cert. denied, 790 So.2d 1012 (Ala.2001), cert. denied, 533 U.S. 936, 121 S.Ct. 2565, 150 L.Ed.2d 729 (2001) (where potential juror appeared to be unable to read or write, the prosecutor’s reason for the strike was race neutral).
In Ex parte McNair, 653 So.2d 353 (Ala.1994), cert. denied, 513 U.S. 1159, 115 S.Ct. 1121, 130 L.Ed.2d 1084 (1995), the Alabama Supreme Court addressed a similar situation and stated:
*984 “The prosecutor stated that he had stricken juror Leonard on the ground that he was 82 years old and ‘slow,’ and jurors Bracken, Brady, Rivers, and Thomas, on the ground that they were too young (i.e., too close in age to McNair). Age may serve as a legitimate racially neutral reason for a peremptory strike, see Jelks v. Caputo, [607 So.2d 177 (Ala.1992) ]; Harrell [v. State, 555 So.2d 263, 268, n. 1 (Ala.1989) ]; Ex parte Bird, 594 So.2d 676 (Ala.1991); especially when, as with Leonard, the age of the individual, when coupled with his demeanor, indicates inattentiveness and a general inability to follow the progress of the trial. See Nesbitt [v. State, 531 So.2d 37 (Ala.Crim.App. 1987) ]. The record also indicates that the prosecutor struck whites within the same age group as jurors Bracken, Brady, Rivers, and Thomas. Again, this consistency indicates racially neutral striking on the prosecutor’s part.”
653 So.2d at 357. See also Ex parte Dunaway, 746 So.2d 1042, 1046 (Ala.1999), cert. denied, 529 U.S. 1089, 120 S.Ct. 1724, 146 L.Ed.2d 645 (2000).
Thus, these were valid nonracial reasons for striking the potential jurors as to whom Dotch asserts a Batson challenge. “ ‘Within the context of Batson, a “race-neutral” explanation “means an explanation based on something other than the race of the juror.” ’ ” Riley v. State, 875 So.2d 352, 355 (Ala.Crim.App.2003), quoting Allen v. State, 659 So.2d 135, 147 (Ala.Crim.App.1994), quoting in turn, Hernandez v. New York, 500 U.S. 352, 360, 111 S.Ct. 1859, 114 L.Ed.2d 395(1991). Here, there were valid nonracial reasons for the prosecutor’s strikes, and a review of the record does not indicate any racial bias or discriminatory purpose behind the prosecutor’s removal of the African-American prospective jurors.
VII.
Dotch argues that the trial court improperly removed a juror for cause who could have listened to the judge’s instructions and who could have been impartial in evaluating the evidence and arriving at a decision.
The record indicates that the potential juror was removed by the trial court after extensive questioning. The judge determined that the veniremember could not, and would not, work with or listen to other people when dealing with an important matter about which he had an opinion. For this reason, the trial court decided that the potential juror could not perform the duties required of a fair and proper juror. Therefore, the trial court removed the veniremember from the panel.
The following transpired at trial:
“[Potential juror]: Really, I have nothing against the death penalty or a capital case, but when I walked in, my first impression was I said I’d never — I don’t believe I could give the panel, the other people and me, just team up with them and do it.
“THE COURT: Say that a little bit—
“[Potential juror]: I’m a person that I raise animals. I stay with animals. I’m not around a lot of people and I don’t believe I could agree with 11 other people on most anything. I mean, that’s the honest—
“THE COURT: I appreciate your candor. I’m just not sure what to do with it.
“[Potential juror]: Well, I don’t know what to do with it either, but that’s me. That’s the way I am. I’ve been doing it a long time.
“THE COURT: That’s fine.
“[Potential juror]: And I just don’t see where I could sit with 11 other *985 people and render that kind of sentence that has to be done.
[[Image here]]
“[Potential juror]: I can’t — I cannot say that I can sit there with 11 other people and weigh all the evidence because I don’t think I’m capable of doing it. I mean, I just — I’ve been a loner all my life and I just don’t see how I could get together with that. Coming down to me having to make that decision, I just couldn’t.
“THE COURT: You couldn’t participate in that process or wouldn’t?
[Potential juror]: I could not.
[[Image here]]
“THE COURT: He’s leaning like he’s having a little difficulty hearing you. Speak up so I can hear you too.
“[Prosecutor]: We asked a question on the questionnaire, is there any information about which you feel the Judge and the attorneys should know in reference to your ability to serve as a juror, and you said yes. And you said I have a tendency to think that a lot of people don’t tell the truth. What exactly did you mean by that?
“[Potential juror]: I have a tendency to know that people do not always tell the truth. I’m not talking about witness — I am the type person I don’t — I don’t like sympathy or whatever, emotional stuff, and when it comes down to bare facts, when lawyers ask the question and then the witness can’t — don’t make the answer, then I feel like it’s something that should have been said and I get that — I said, well, I ain’t heard all I need to know. And I know that’s the way trials are run, but that’s why I say I don’t believe I need to be part of it.
“THE COURT: All right. [Defense counsel]?
“[Defense counsel]: [Potential juror], you said you don’t really have anything against the death penalty; is that right?
“[Potential juror]: No.
“[Defense counsel]: So, that would be something if you wound up in that — you know, in the jury, you would at least be able to consider that, wouldn’t you, if you got to that point?
“[Potential juror]: No.
“[Defense counsel]: You don’t think there’s any — I’m sorry. Go ahead.
“[Potential juror]: When I walked through the door, I took a mental picture of this room, the people sitting around. I said, no, I can’t do it. I’m not going to do it. That’s just as honest as I can be.
“[Defense counsel]: I appreciate that. And we all do. This isn’t something anybody wants to do.
“[Potential juror]: That’s the reason I say I don’t want to waste the Court’s time with putting me in a situation where I’m not going to be able to sit and discuss because part of the people that I’ll be discussing this with won’t be the same kind of people I am. I’m talking about like I was a construction worker all my life and these other people probably be better educated than I am, and I just don’t feel like I’ll be able because—
“THE COURT: Okay.
“[Defense counsel]: Would you be able to listen to the Judge’s instructions and follow those?
“[Potential juror]: I can listen to his instructions and follow those as long as I can remember, but I can’t remember a lot of details and I don’t want to have a detail — I do have a little hearing problem too, especially when the lady was doing the talking.
“[Defense counsel]: Let me ask you this because, I mean, that’s why you *986 have the jury of' 12 people because nobody is going to remember all the details, no one person. And understanding that whatever decision that you felt was right would be your sole decision, you don’t have to, you know, agree with everybody else. It’s not necessary that you agree with everybody else. It’s whatever [potential juror] feels is right based upon the evidence that you heard. Could you do that?
“[Potential juror]: Well, the Judge yesterday — We have to have a lot of patience, and I don’t have a lot of patience. I mean, that’s just me. And if I got on the panel when some people had some reason why that they — that I didn’t think they was going to deal straight, then we just wouldn’t get along. That’s my problem. And I don’t want to get into that situation.”
(R. 334-39.)
Thereafter, outside the presence of the potential juror, the following discussion was had by the parties and the trial court:
“THE COURT: [Potential juror] poses a bit of a unique situation, and what I thought was very straightforward is that as far as the deliberation process and listening to other people and sharing views, he, as a whole, said that not only could he not do that, he would not do that. And I don’t think that would be fair to [Dotch] or to the State to have someone that would not be willing to listen to other jurors’ views.
“[Prosecutor]: He’s a Court strike, right?
“THE COURT: I think he’s unqualified to serve on the jury, so I will not require y’all to make a challenge.
“[Defense counsel]: Your Honor, we would except to him being struck.
“THE COURT: That’s fine. Let me just amplify for the moment for the record, it’s not that he had a strong view, it’s not that he would be a man to strike for his view. That’s not the issue. But like in a dynamite charge, you tell people listen to everyone else’s point of view and consider everyone else’s point of view without sacrificing your own opinions. [Potential juror] seemed, by his demeanor, his appearance in court seemed to be very emphatic that he would have an opinion and that’s all that he would consider during deliberations and he could not participate in the give and take.
“He indicated that he has a lack of patience with people that disagree with him. He said that he doesn’t think people tell the truth, and he said he has a hard time hearing women. We have two State attorneys. I’m going to remove him over your exception.
“[Defense counsel]: Judge, if I might just make sure I have the record clear. By way of reasons for our exception, the man said he could listen to your instructions. He did say that he didn’t know if he would — could go along with everybody else, and I would submit that that’s not a juror’s duty to go along with everybody else. Each person has to reach their own decision ever how it is, and he did not — as the Court said, he seemed to have a pretty definite idea about how he would function.
“But he’s distrustful. I submit that’s not a bad quality in a juror, that they should question the evidence. They should question in their mind the witnesses, their motivation, their ability to recall and relate whatever it is they’re testifying about, and I think he has not demonstrated sufficiently that he is unqualified or unwilling to serve as a juror and we would, therefore, except to the Court’s ruling.”
(R. 340-42.)
Although Dotch points to and isolates the potential juror’s statements indi- *987 eating that he could listen to and follow the trial court’s instructions, the venire-member was consistent and clear in stating that he could not serve in a group context in which he would be required to listen to other people’s opinions, to compromise, or to evaluate and exchange ideas and opinions. It was for this reason that the trial judge who was in a position to observe the veniremember’s demeanor and to listen to his explanations removed the potential juror.
“The jury’s role in a trial is to ‘ “ ‘assure a fair and equitable resolution of factual issues.”” [United States v.] Richardson, 233 F.3d 1285, 1289 [ (11th Cir.2000) ] (quoting Standard Oil Co. of California v. Arizona, 738 F.2d 1021, 1031 (9th Cir.1984), quoting in turn Colgrove v. Battin, 413 U.S. 149, 157, 93 S.Ct. 2448, 37 L.Ed.2d 522 (1973)).... Proper communication is necessary for a jury to correctly fulfill its fact-finding duty....”
Ex parte Malone, 12 So.3d 60, 63-64 (Ala.2008).
Group interaction and deliberation by jury members promotes, and is essential to, the fact-finding process. As stated in People ex rel. Hunter v. District Court, 634 P.2d 44 (Colo.1981):
“[T]he term ‘jury’ connotes a deliberative body of persons. The word ‘jury’ has been defined as:
“ ‘A body of men sworn to give a verdict upon some matter submitted to them; ... a body of men selected according to law, impaneled and sworn to inquire into and try any matter of fact, and to give their verdict according to the evidence legally produced.’ Webster’s Third New International Dictionary, 1966.
“See also Black’s Law Dictionary 993 (rev. 4th ed.1968); Williams [v. Florida, 399 U.S. 78, 90 S.Ct. 1893, 26 L.Ed.2d 446 (1970) ]; Duncan v. Louisiana, 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968); Singer v. United States, 380 U.S. 24, 85 S.Ct. 783, 13 L.Ed.2d 630 (1965).
“In Williams, supra, the Supreme Court speaking to the size of a jury stated:
“ ‘... the essential feature of a jury obviously lies in the interposition between the accused and his accuser of the commonsense judgment of. a group of laymen, and in the community participation and shared responsibility that results from that group’s determination of guilt or innocence. The performance of this role is not a function of the particular number of the body that makes up the jury. To be sure, the number should probably be large enough to promote group deliberation, free from outside attempts at intimidation, and to provide a fair possibility for obtaining a representative cross-section of the community. ...’
“It is thus obvious that a jury may not be composed of a single person. If the accused desires a one person determination of his guilt or innocence, he may waive the jury and be tried by the court.”
634 P.2d at 46-47.
Here, the trial court removed a potential juror who honestly confessed that he was unable and unwilling to serve as a fair and effective juror as far as deliberating with the other jurors. Whether a prospective juror is qualified to serve as a member of a jury is a matter within the discretion of the trial court. “This determination, again, is to be based on the juror’s answers and demeanor and is within the sound discretion of the trial judge.” Knop v. McCain, 561 So.2d 229, 232 (Ala.1989.) “This Court must look to *988 the questions propounded to, and the answers given by, the prospective juror to see if this discretion was properly exercised .... A reversal is not appropriate absent abuse of this discretion.” Ex parte Ellington, 580 So.2d 1367, 1369 (Ala.1990). The trial court in the present case did not abuse its discretion by removing this potential juror from the panel.
VIII.
Dotch argues that the trial court produced a conviction-prone jury by death-qualifying the venire and thereby denied Dotch his right to a fair trial. Specifically, he contends that death-qualifying a jury results in an impartial jury for the following reasons: because such juries are significantly more prone to convict the defendant; because pretrial death-qualification assumes a defendant’s guilt, causing the jury to be “condition[ed]” toward guilt; and because death-qualification disproportionately excludes minorities and women.[17] (Dotch’s brief, at 109.)
In Lockhart v. McCree, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986), the United States Supreme Court held that veniremembers in a capital-murder trial may be “death-qualified” to determine their views on capital punishment. The appellate courts in Alabama have repeatedly applied the Lockhart holding. As this Court stated in Sockwell v. State, 675 So.2d 4 (Ala.Crim.App.1993):
“ ‘In Lockhart v. McCree, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986), the Supreme Court held that the Constitution does not prohibit states from “death qualification” of juries in capital cases and that so qualifying a jury does not deprive a defendant of an impartial jury. 476 U.S. at 173, 106 S.Ct. at 1764. Alabama Courts have consistently held likewise. See Williams v. State, 556 So.2d 737 (Ala.Crim.App.1986), rev’d in part, 556 So.2d 744 (Ala.1987); Edwards v. State, 515 So.2d 86, 88 (Ala.Crim.App.1987); Martin v. State, 494 So.2d 749 (Ala.Crim.App.1985).’
“675 So.2d at 18.”
Lee v. State, 44 So.3d 1145, 1161-62 (Ala.Crim.App.2009).
In Sneed v. State, 1 So.3d 104 (Ala.Crim.App.2007), cert. denied, — U.S. —, 129 S.Ct. 1039, 173 L.Ed.2d 472 (2009), Sneed raised the same issues Dotch raises, and this court found no merit to his claims, stating:
“The appellant also argues that death-qualifying a jury is unconstitutional because the jurors are more prone to convict, it assumes that the defendant is guilty, and it disproportionately excludes minorities and women. In Davis v. State, 718 So.2d 1148, 1157 (Ala.Crim.App.1995) (opinion on return to remand), aff'd, 718 So.2d 1166 (Ala.1998), we stated:
“‘A jury composed exclusively of jurors who have been death-qualified in accordance with the test established in Wainwright v. Witt, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), is considered to be impartial even though it may be more conviction prone than a non-death-qualified jury. Williams v. State, 710 So.2d 1276 (Ala.Cr.App.1996). See Lockhart v. McCree, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986). Neither the federal nor the state constitution prohibits the state from[ ] death-qualifying jurors in capital cases. Id.; *989 Williams; Haney v. State, 603 So.2d 368, 391-92 (Ala.Cr.App.1991), aff'd, 603 So.2d 412 (Ala.1992), cert. denied, 507 U.S. 925, 113 S.Ct. 1297, 122 L.Ed.2d 687 (1993).’
“(Footnote omitted.) Therefore, the appellant’s argument is without merit.”
1 So.3d at 136-37.
Therefore, these issues have previously been determined adversely to Dotch’s arguments, and there is no merit to these claims.
IX.
Dotch alleges that the trial court improperly admitted gruesome and unduly prejudicial photographs of the victim, which, he says, requires that his conviction be overturned. Dotch refers to crime-scene and autopsy photographs without specifying the exact photographs that he found unduly prejudicial.
Moreover, Dotch did not object to the introduction of any of these photographs at trial nor did he raise this claim in any motion before the trial court. (R. 687-88.) Therefore, any error must rise to the level of plain error. Rule 45A, Ala. R.App.P.
 Dotch simply argues that because the cause of the Taldon’s death was undisputed, the probative value of the photographs was outweighed by their prejudicial effect. “The fact that a photograph is gruesome is insufficient ground for its exclusion if, after proper authentication and identification, it tends to shed light on, strengthen, or illustrate the truth of other material testimony. 6 Ala.Digest, Criminal Law 438; Nichols v. State, 267 Ala. 217, 100 So.2d 750 (1958); McHugh v. State, 53 Ala.App. 473, 301 So.2d 238 (1974).” Watts v. State, 337 So.2d 91, 92 (Ala.Crim.App.1976) (photograph was illustrative of testimony concerning the nature and location of the wound and was properly admitted although the evidence was un-controverted that shooting was the cause of death and Watts presented an insanity defense).
“The fact that a photograph has very little probative value does not prevent its admission in evidence where the photograph will tend to shed light on, strengthen or illustrate the truth of other testimony, or where the photograph has reasonable tendency to prove or disprove some material fact or issue in the case, or is used to identify the deceased or to illustrate the location, nature or extent of a wound. Gilmore v. State, 346 So.2d 1193 (Ala.Cr.App.1977). The evidentiary rule in this state favors the admission of photographs and affords the trial court a wide and liberal latitude in the admission of photographs illustrative of a criminal transaction and the surrounding circumstances. Arnold v. State, 348 So.2d 1092 (Ala.Cr.App.1977), cert. denied, Ex parte Arnold, 348 So.2d 1097 (1977); Lewis v. State, 339 So.2d 1035 (Ala.Cr.App.1976), cert. denied, 339 So.2d 1038 (Ala.1976).”
Lawrence v. State, 409 So.2d 987, 990 (Ala.Crim.App.1982).
A review of the photographs admitted, as well as the testimony concerning these photographs, shows that the photographs were properly admitted and were not overly prejudicial. They did not emphasize, exaggerate, or distort the victim’s wounds, nor did they misrepresent the crime scene. Further, they were illustrative of the crime scene and of the location of the victim’s wounds. This evidence was relevant and was in dispute because Dotch contended that the victim may not have been in her vehicle when she was shot.
X.
Dotch argues that § 13A-5^40(a)(17), Ala.Code 1975, is unconstitutionally vague *990 and overbroad. He alleges that there is no reasonable justification for imposing the death penalty when the victim of the shooting is inside a stationary vehicle but not when the victim is standing outside the same vehicle.
In May v. State, 710 So.2d 1362 (Ala.Crim.App.1997), this Court upheld the constitutionality of § 13A-5-40(a)(17) against a claim that the statute violates a defendant’s rights to equal protection. In so doing, this Court held:
“The only act made capital by § 13A-5-40(a)(17), Ala.Code 1975, is the intentional murder of a person in a vehicle. ‘Murder is not a constitutionally protected activity.’ Ex parte Woodard, 631 So.2d 1065, 1068 (Ala.Cr.App.1993), cert. denied, 662 So.2d 929 (Ala.), cert. denied, 513 U.S. 869, 115 S.Ct. 190, 130 L.Ed.2d 123 (1994). Even so, there is a rational basis for the legislature’s recognition of killers whose victims are killed while in a vehicle as a separate class, and making that offense punishable by either life imprisonment or the death penalty. The facts in the instant case serve well to demonstrate one rational basis which the legislature could have considered in enacting the statute. Marcum, suffering a mortal wound, attempted to drive from the scene of the shooting. He lost control of the car and crashed into other vehicles parked nearby. Fortunately, no one else was injured by the runaway vehicle in this instance.
“Here, the classification by the legislature of the killer of a person in a vehicle as one guilty of a capital offense has a rational basis.”
710 So.2d at 1365. See also Key v. State, 891 So.2d 353, 368 (Ala.Crim.App.2002), affirmed, 891 So.2d 384 (Ala.2004), cert. denied, 543 U.S. 1005, 125 S.Ct. 608, 160 L.Ed.2d 466 (2004) (holding that Key would not have been entitled to relief on his claim that § 13A-5^40(a)(17) is unconstitutionally vague and arbitrary and that “to punish a defendant whose victim was sitting in a car differently from a defendant whose victim stumbled away from a car violated equal-protection principles” because this Court “has previously considered and rejected the constitutional arguments” raised by Key).
Moreover, this Court has affirmed the rationale for making § 13A-5-40(a)(17), Ala.Code 1975, a capital offense. In Farrior v. State, 728 So.2d 691 (Ala.Crim.App.1998), this Court wrote:
“The facts in this case demonstrate one situation the legislature sought to address by enacting the statute. The appellant fired at McCombs’ car several times. There were four people in the car, including two very young children. Another car driven by Nicole Jackson, who had her baby in the car, was nearby. Because of the mobile nature of a vehicle, there is an increased risk of harm to the driver, passenger, pedestrians, bystanders, and people in other vehicles if a person fires into a vehicle with a deadly weapon. Furthermore, the recent increase in drive-by shootings, carjackings, and other random acts of violence involving vehicles could have led the legislature to enact the statute. There are several fact situations that would serve as rational reasons for classifying this type of intentional murder as capital murder. Accordingly, as we held in May [v. State, 710 So.2d 1362 (Ala.Crim.App.1997) ] § 13A-5-40(a)(17) does not violate the appellant’s equal protection rights.”
Farrior v. State, 728 So.2d at 701.
Because a rational basis exists for making the intentional killing of a victim who is inside a vehicle a capital offense, Dotch’s claim of unreasonableness is *991 without merit. Moreover, this statute is not overly broad or void as being too vague. Compare Merrill v. State, 741 So.2d 1099, 1107 (Ala.Crim.App.1997) (§ 13A-5-40(a)(18), Ala.Code 1975, which defines as a capital offense an intentional murder committed by or through the use of a deadly weapon fired or otherwise used within or from a vehicle, is constitutional despite Merrill’s claim that the statute is vague for failing to “specify whether the vehicle must be operable or being driven and ... fail[ing] to state whether the victim may be an occupant of the vehicle or must be outside the vehicle”).
“ ‘To withstand a challenge of vagueness, a statute must: 1) give a person of ordinary intelligence a reasonable opportunity to know what is prohibited, and, 2) provide explicit standards to those who apply the laws. Grayned [v. City of Rockford, 408 U.S. 104, 108-09, 92 S.Ct. 2294, 2298-99, 38 L.Ed.2d 222 (1972) ].
“ ‘ “[T]his prohibition against excessive vagueness does not invalidate every statute which a reviewing court believes could have been drafted with greater precision. Many statutes will have some inherent vagueness, for ‘[i]n most English words and phrases there lurk uncertainties.’ Robinson v. United States, 324 U.S. 282, 286, 65 S.Ct. 666, 668, 89 L.Ed. 944 (1945). Even trained lawyers may find it necessary to consult legal dictionaries, treatises, and judicial opinions before they may say with any certainty what some statutes may compel or forbid.”
“ ‘Rose v. Locke, 423 U.S. 48, 49-50, 96 S.Ct. 243, 244, 46 L.Ed.2d 185 (1975). “A defendant who challenges a statute on the ground of vagueness ‘must demonstrate that the statute under attack is vague as applied to his own conduct, regardless of the potentially vague applications to others.’ ” Senf v. State, 622 So.2d 435, 437 (Ala.Crim.App.1993), quoting Aiello v. City of Wilmington, 623 F.2d 845, 850 (3rd Cir.1980).(Emphasis supplied [in Culbreath].)' ”
State v. Randall, 669 So.2d 223, 225-26 (Ala.Crim.App.1995).
Here, the statute clearly notified Dotch of the prohibited conduct and provided explicit standards to prevent arbitrary or discriminatory enforcement. Thus, it was not unconstitutionally vague. Moreover, it does not prohibit, nor does Dotch actually claim that it prohibits, constitutionally protected conduct, so as to be overbroad. Grayned v. City of Rockford, 408 U.S. 104, 114-15, 92 S.Ct. 2294, 2302, 33 L.Ed.2d 222 (1972).
Finally although Dotch argues in a separate issue (Dotch’s brief, Issue XI) that the death penalty was disproportionate to the nature of this crime, this issue is also without merit. Dotch submits that his sentence was excessive because other defendants who were convicted of violating only § 13A-5-40(a)(17), Ala.Code 1975, had been sentenced to life imprisonment without parole where the facts more directly tied the victim to the vehicle. However, the facts and evidence supporting Dotch’s conviction also support his sentence to death.
As this Court stated in McGriff v. State, 908 So.2d 961 (Ala.Crim.App.2000), reversed on other grounds, 908 So.2d 1024 (Ala.2004):
“ ‘Furthermore, the sentencing procedure for a person convicted of violating § 13A-5nlO(a)(17), Ala.Code 1975, is constitutionally sound.
“ ‘ “ ‘A capital sentencing scheme must ... provide a “ ‘meaningful basis for distinguishing the few cases in which [the death penalty] is imposed from the many cases in which it is not.’ ” [Gregg v. Georgia, *992 428 U.S. 153, 96 S.Ct. 2909, 2932, 49 L.Ed.2d 859 (1976) ], quoting Furman v. Georgia, [408 U.S. 238, 313, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) ] (White, J., concurring).
“ ‘ “ ‘This means that if a State wishes to authorize capital punishment it has a constitutional responsibility to tailor and apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty.’
“ ‘ “Godfrey v. Georgia, 446 U.S. 420, 427-428, 100 S.Ct. 1759, 1764, 64 L.Ed.2d 398, 406 (1980).”
“ ‘[Ex parte] Woodard, 631 So.2d [1065] at 1069 [ (Ala.Crim.App.1993), cert. denied, 662 So.2d 929 (Ala.), cert. denied, 513 U.S. 869, 115 S.Ct. 190, 130 L.Ed.2d 123 (1994) ].
[[Image here]]
“ ‘... Not every death of a victim in a vehicle will constitute capital murder. Section 13A-5-40(a)(17) requires that, to constitute a capital offense, the murder must be intentional. Therefore, the statute is not inconsistent with the United States Supreme Court’s holding in Enmund v. Florida, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982). In addition, a conviction under this statute does not automatically result in a mandatory death sentence. Instead, “ ‘[u]pon conviction of a defendant for a capital offense, the trial court [conducts] a separate sentencing hearing to determine whether the defendant shall be sentenced to life imprisonment without parole or to death.’ ” Hadley v. State, 575 So.2d [145] at 152 [ (Ala.Crim.App.1990) ], quoting § 13A-5-45(a), Ala.Code 1975.
“ ‘ “ ‘[T]he [United States Supreme] Court has imposed two general requirements on the capital sentencing process. First, a state must channel the sentencer’s discretion in order to “genuinely narrow the class of persons eligible for the death penalty and ... [thus] reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder.” Second, the State may not limit the sentencer’s consideration of any relevant evidence that might lead the sentencer to decline to impose the death penalty.
“ ‘ “ ‘The required narrowing of the class of death-eligible defendants may occur at either the guilt or the sentencing phase of a capital trial. When narrowing is accomplished during the sentencing phase, the sentencer determines whether certain characteristics of the crime, known as aggravating circumstances, distinguish the gravity of the offense so as to justify the imposition of the death penalty.’ ”
“ ‘Woodard, 631 So.2d at 1070 (citations omitted).
[[Image here]]
[[Image here]]
“ ‘ “[T]he legislature has clearly classified certain crimes as ‘capital offenses,’ § 13A-5-40, and it has set the minimum punishment for such crimes as imprisonment for life without parole, see §§ 13A-5-45(f); 13A-5-46(e)(l). This is no different from the legislature’s classifying other offenses for purposes of punishment and establishing minimum and maximum punishments for each classification. See §§ 13A-5-53; 13A-5-6; 13A-5-7. A greater punishment — death—may be imposed on a defendant convicted of a capital offense, but only if one or more of *993 the aggravating circumstances enumerated in § 13A-5-49 is found to exist and that aggravating circumstance(s) outweighs any mitigating circumstance(s) that may exist.”
[[Image here]]
. Thus, for a defendant to be sentenced to death upon conviction for violating § 13A-5-40(a)(17), the defendant must be guilty of the intentional murder committed through the use of a deadly weapon while the victim is in a vehicle “and the sentencer must find the existence of at least one of the aggravating circumstances enumerated in § 13A-5-49, thereby narrowing the class of ‘death-eligible’ defendants.” Woodard, 631 So.2d at 1070.
“ ‘ “ ‘[W]hen, in the opinion of the legislature, a class of victims require[s] special protection and the statutory scheme provides a meaningful method of narrowing the class of defendants who are death eligible, the statute is not constitutionally infirm.’ ”
“ ‘Woodard, 631 So.2d at 1072 (citation omitted). Alabama’s capital sentencing scheme delineates a precise procedure to determine whether a defendant convicted under this statute will be sentenced to death or to life imprisonment without the possibility of parole. Furthermore, it narrows the class of “death-eligible” defendants. Accordingly, the procedure for sentencing a person convicted of violating § 13A-5-40(a)(17) withstands the appellant’s challenges.’
“Farrior [v. State], 728 So.2d [691] at 701-03 [ (Ala.Crim.App.1998) ]. See also Merrill v. State, 741 So.2d 1099 (Ala.Crim.App.1997); May v. State, 710 So.2d 1362 (Ala.Crim.App.1997).”
McGriff v. State, 908 So.2d at 1008-10.
Thus, because the sentencing procedures for a murder committed under § 13A-5-40(a)(17) are constitutionally sound and because the facts and evidence supported a finding that Dotch violated this statute, his sentence was proper. Moreover, other defendants in Alabama who have been convicted of violating this statute have been sentenced to death. See, e.g., Key v. State, 891 So.2d 353 (Ala.Crim.App.2002); Knight v. State, 907 So.2d 470 (Ala.Crim.App.2004).
Because § 13A-5-40(a)(17), Ala.Code 1975, is not unconstitutional as overly vague or overbroad and because it has a rationale for its application, Dotch’s claims have no merit. Moreover, the death penalty in this case was not disproportionate as compared to the crime.
XI.
Dotch argues that the cumulative effect of errors committed at trial requires a reversal of his conviction and sentence. Dotch fails to specify any errors; rather he cites those he has previously argued in briefs.
“The Alabama Supreme Court has set forth the cumulative-error rule as follows: ‘[W]hile, under the facts of a particular case, no single error among multiple errors may be sufficiently prejudicial to require reversal under Rule 45, if the accumulated errors have “probably injuriously affected substantial rights of the parties,” then the cumulative effect of the errors may require reversal.’ Ex parte Woods, 789 So.2d 941, 942-43 n. 1 (Ala.2001) (quoting Rule 45, Ala.R.App.P.).”
Lewis v. State, 24 So.3d 480, 538 (Ala.Crim.App.2006), affirmed, 24 So.3d 540 (Ala.2009), cert. denied, Lewis v. Alabama, — U.S. —, 130 S.Ct. 796, 175 L.Ed.2d 562 (2009).
*994 A careful and thorough review of the record as to the guilt and sentencing phases of Dotch’s trial reveals no evidence that' the cumulative effect of any of the alleged errors affected Dotch’s substantial rights. Brown v. State, 11 So.3d 866, 932 (Ala.Crim.App.2007), affirmed, 11 So.3d 933 (Ala.2008), cert. denied, — U.S. —, 129 S.Ct. 2864, 174 L.Ed.2d 582 (2009).
XII.
Dotch argues that the trial court erred in failing to find the existence of the statutory mitigating circumstance of his substantially impaired capacity based on the jury’s rejection of his mental-disease- or-defect defense at the guilt phase of his trial. Specifically, Dotch argues that the standards for analyzing the affirmative defense of mental disease or defect and those for analyzing the mitigating circumstance of substantially impaired capacity differ. Therefore, he contends that the trial court improperly used the analysis for the affirmative defense in determining that the mitigating circumstance did not exist. Further, he alleges that because his burden in proving the mitigating factor was substantially less than his burden in proving the affirmative defense, the trial court should have applied the correct standard and found that the mitigating circumstance existed.
The record indicates that the trial court made the following findings concerning the mitigating circumstance that Dotch’s “capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired,” pursuant to § 13A-5-51(6), Ala. Code 1975:
“Substantially Impaired, Capacity: The defense injects this mitigator. Dr. Van Rosen testified the defendant has a full scale IQ of 77 and suffers from a delusional disorder, polysubstance abuse and personality disorder. Dr. Van Ro-sen relied upon these diagnoses, the history of mental illness suffered by the defendant’s mother, and the defendant’s own history of mental treatment to support his opinion that the defendant suffered from a severe mental disease or defect at the time of the commission of the offense. The jury rejected the mental disease or defect defense in finding the defendant guilty of intentional murder. The State presented Dr. Douglas McKeown, a psychologist, who testified that the defendant’s only mental difficulties resulted from his continuous use of cocaine. He diagnosed the defendant with personality disorder with antisocial features, polysubstance abuse, a history of possible thought disturbance, and low average intelligence. No evidence was presented to indicate cocaine abuse lowered the defendant’s mental capacity or impaired his ability to understand ‘the requirements of law,’ or the consequences of his actions at the time of the murder.
“The jury’s rejection of the defendant’s argument for a lesser-included conviction for manslaughter based on a voluntary intoxication theory demonstrates that the jury believed the defendant was able to ‘appreciate the criminality of his conduct’ and that his ability to ‘conform his conduct to the requirements of law was [not] substantially impaired.’ In finding the defendant guilty of capital murder, the jury necessarily rejected the theory that he was so intoxicated by illegal drugs that he failed to form an intent to commit murder.
“The Court does not disagree with the jury’s conclusion to reject the plea of insanity. The deliberate manner in which the defendant carried out the commission of the offense, coupled with a prior threat to commit the offense, does not demonstrate that the defendant *995 suffered from a diminished mental capacity. The Court specifically finds the defendant was not substantially impaired in his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law. Accordingly, this statutory mitigator is found not to exist, and the Court gives it no weight.”
(C. 565-67.)
Despite Dotch’s claim, the judge’s references to the evidence presented at trial and the jury’s findings do not mean that the judge applied the wrong standard and used the incorrect analysis in considering this mitigating factor. In fact, the trial judge used the language included in the definition of the mitigating factor.
The prosecutor stated at the sentencing phase that he was introducing and relying on all the evidence that had been presented during the guilt phase. “Section 13A-5-47(d), Ala.Code 1975, requires a trial court to consider the presentence report, along with the evidence presented during the guilt and penalty phases of the trial in determining whether aggravating and mitigating circumstances exist and how much weight they should be accorded.” Johnson v. State, — So.3d —, — (Ala.Crim.App.2009). Compare Spencer v. State, 58 So.3d 215, 253 (Ala.Crim.App.2008) (in which Spencer argued that because there was evidence at trial indicating that he had ingested cocaine, the trial court should have found that he was substantially impaired, and this Court determined that, “[although the evidence in the record supports the trial court’s conclusion that the mitigating circumstance in § 13A-5-51(6), Ala.Code 1975, was not present, we question the propriety of the assertion that ‘[tjhere was no evidence presented that Kerry Spencer’s capacity to appreciate the criminality of his conduct or to conform his conduct to the requirement of law was substantially impaired during the commission of this offense.’ (Emphasis added.)”).
A trial court is required to consider all the evidence offered for mitigation when sentencing a capital defendant. In Lewis v. State, 889 So.2d 623 (Ala.Crim.App.2003), this Court found that, although the trial court did not find the existence of the mitigating circumstances that Lewis had been of substantially impaired (§ 13A-5-51(6)) or that he had been under the influence of extreme mental or emotional disturbance (§ 13A-5-51(2)), the court properly considered all of the mitigating evidence. This Court stated:
“Regarding the statutory mitigating circumstances that the offense was committed while Lewis was under the influence of extreme mental or emotional disturbance and that Lewis’s capacity to appreciate the criminality of his conduct or to conform his conduct to the law was substantially impaired, the court specifically stated that it had considered the ‘great deal of evidence’ that had been presented regarding Lewis’s history of mental illness. (C. 14.) In addition, although the trial court did not find any nonstatutory mitigating circumstances to exist under § 13A-5-52, Ala.Code 1975, it indicated in its order that it had considered ‘all of the evidence presented during all stages of the trial in this cause, as well as the Court’s observation and evidence admitted during all proceedings, pretrial and posttrial.’ (C. 14.) Based on its sentencing order, it is clear that the trial court fully complied with Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), and its progeny in that it considered all evidence that could possibly have been considered mitigating.”
889 So.2d at 692.
Furthermore, although in Lewis v. State, 889 So.2d at 693, Lewis also argued that *996 the trial court “improperly applied the standard for insanity,” by “specifically noting in its order that Lewis was aware of the wrongfulness of his actions and that he exercised his own volition in committing the crimes.” However, this Court found no merit to that claim, stating that “[c]ontrary to Lewis’s contention, merely because the court found that Lewis was aware of the wrongfulness of his actions and the criminality of his conduct does not mean that the court applied the standard of legal insanity to the mitigating evidence. See, e.g., Ferguson v. State, 814 So.2d 925 (Ala.Crim.App.2000), aff'd, 814 So.2d 970 (Ala.2001), cert. denied, 535 U.S. 907, 122 S.Ct. 1208, 152 L.Ed.2d 145 (2002) (holding that the trial court’s statement in its sentencing order that Ferguson was not ‘insane’ did not show that the trial court applied the standard of insanity to Ferguson’s proffered evidence of mitigation).” Id.
Here, there is no indication that the trial court used the analysis for determining legal insanity in determining the nonexistence of the mitigating circumstance that Dotch’s capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired. The record indicates that based on the evidence, the trial court determined that the State disproved the existence of the mitigating circumstance by a preponderance of the evidence. § 13A-5-45(g), Ala.Code 1975.
XIII.
Dotch argues that the trial court abused its discretion by excluding mitigation testimony from Dotch’s family. Specifically, he contends that the trial court improperly ordered Dotch’s brother and father to refrain from volunteering their opinions as to what the jury should recommend for sentencing and from asking for mercy. Dotch contends that the witnesses’ opinions as to sentencing should have been admitted as mitigating evidence concerning Dotch’s character.
In Taylor v. State, 666 So.2d 36 (Ala.Crim.App.1994), this Court held that the trial court properly refused to allow Taylor’s family and friends to ask the jury to spare his life. In holding that this action by the trial court did not prevent the jury from considering mitigation evidence, this Court stated:
“ ‘[T]he opinion of a relative of a victim is irrelevant to the jury’s determination of whether the death penalty should be imposed.’ Robison v. Maynard, 943 F.2d 1216, 1217 (10th Cir.), cert. denied, 502 U.S. 970, 112 S.Ct. 445, 116 L.Ed.2d 463 (1991). See also Robison v. Maynard, 829 F.2d 1501, 1504-05 (10th Cir.1987). Such testimony is ‘calculated to incite arbitrary response’ from the jury. Robison, 829 F.2d at 1505.
“Although Payne v. Tennessee, 501 U.S. 808, 826-28, 111 S.Ct. 2597, 2609, 115 L.Ed.2d 720 (1991), held that the Eighth Amendment does not prohibit the admission of ‘victim impact’ evidence at the sentencing phase of a capital trial,
“ ‘Payne merely put aside the bar to the introduction of and comment upon victim impact evidence which had been created in Booth [v. Maryland, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987) ], and South Carolina v. Gathers, 490 U.S. 805, 109 S.Ct. 2207, 104 L.Ed.2d 876 (1989). The Court did not expand the universe of admissible relevant mitigating evidence established by Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), and Eddings v. Oklahoma, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982).... We cannot agree that Payne portends admissibility of any evidence other than that *997 related to the victim and the impact of the victim’s death on the members of the victim’s family. Nothing said by the Court suggests the Court intended to broaden the scope of relevant mitigating evidence to include the opinion of a victim’s family member that the death penalty should not be invoked....
[[Image here]]
“Under Alabama law, nonstátutory mitigating evidence must be relevant.
‘“In addition to the mitigating circumstances specified in section 13A-5-51, mitigating circumstances shall include any aspect of a defendant’s character or record and any of the circumstances of the offense that the defendant offers as a basis for a sentence of life imprisonment without parole instead of death, and any other relevant mitigating circumstance which the defendant offers as a basis for a sentence of life imprisonment without parole instead of death.’
“Ala.Code 1975, § 13A-5-52. ‘ “[Subject only to the loose evidentiary requirement of relevance, capital defendants have a right to offer any evidence they choose on character or record or circumstances of the offense.” ’ Clisby v. State, 456 So.2d 99, 101 (Ala.Crim.App.1983) (quoting Stanley v. Zant, 697 F.2d 955, 960 (11th Cir.1983)), cert. denied, 467 U.S. 1219, 104 S.Ct. 2667, 81 L.Ed.2d 372 (1984).
“ ‘Evidence is “relevant” if it logically relates to the ultimate, material inference in the case for which it is proffered.’ J. Colquitt, Alabama Law of Evidence § 4.1 (1990). ‘ “Evidence is relevant if it has any probative value, however slight, upon a matter at issue in the case.’ ” Phelps v. State, 439 So.2d 727, 736 (Ala.Crim.App.1983) “Evidence is relevant if it has any tendency to throw light upon the matter in issue, even though such light may be weak and fall short of demonstration.” Austin v. State, 434 So.2d 289, 292 (Ala.Crim.App.1983).’ Brewer v. State, 644 So.2d 39 (Ala.Cr.App.1994). ‘In this State, evidence is relevant if it has any logical relationship to the purpose for which it is offered.’ Rose v. State, 598 So.2d 1040, 1042 (Ala.Cr.App.1992).
“It is the holding of this Court that the opinion of the friends or relatives of the defendant that the defendant should not be sentenced to death is not a relevant mitigating circumstance for the jury to consider at the penalty phase of a capital case. Compare McGahee v. State, 632 So.2d 976, 978 (Ala.Cr.App.), affirmed, 632 So.2d 981 (Ala.1993) (‘The physical effects of electrocution are not an aspect of the appellant’s character or record and are not relevant to any of the circumstances of the crime; and we conclude that this type of evidence does not constitute evidence of mitigation.’); Hinton v. State, 548 So.2d 547, 560-61 (Ala.Cr.App.1988), affirmed, 548 So.2d 562 (Ala.1989), cert. denied, 493 U.S. 969, 110 S.Ct. 419, 107 L.Ed.2d 383 (1989) (‘We interpret this section to limit mitigating evidence to that which assumes that the defendant committed the crime for which he was convicted.... This court therefore finds that polygraph results which indicate that the defendant is not guilty of the crime for which he is being sentenced are not relevant to either aggravating or mitigating circumstances and thus are inadmissible in a sentencing proceeding under § 13A-5-45(d).’).”
Taylor v. State, 666 So.2d at 51-53.
Thus, Dotch’s brother and father were properly restricted from asking the jury to return a particular sentence or to spare Dotch’s life. Compare Smith v. State, *998 [Ms. CR-97-1258, August 31, 2007] — So.3d —, —(Ala.Crim.App.2000)(opinion on remand from the Supreme Court) (“A capital defendant is not entitled to a mercy instruction in the penalty phase. See Barber v. State, 952 So.2d 393 (Ala.Crim.App.2005); Melson v. State, 775 So.2d 857 (Ala.Crim.App.1999).”).
There is no constitutional requirement that a capital defendant be allowed to ask a jury for mercy.
“[W]e view Proffitt v. Florida, 428 U.S. 242, 96 S.Ct. 2[9]60, 49 L.Ed.2d 913 (1976) to have tacitly held that the availability of such a mercy option to the sentencing authority is not a constitutional requirement. As Mr. Justice White’s concurring opinion in Proffitt points out, the sentencing authority in Florida is required to impose the death penalty on all first degree murderers as to whom the statutory aggravating circumstances outweigh the mitigating circumstances. Proffitt at 260. This required imposition of the death penalty, regardless of mercy, passed constitutional muster in Proffitt, and is in keeping with the concern that arbitrary and capricious imposition of the death penalty be avoided. Hopper v. Evans, 456 U.S. 605, 102 S.Ct. 2049, 72 L.Ed.2d 367 (1982).”
Whisenhant v. State, 482 So.2d 1225, 1236 (Ala.Crim.App.1982), affirmed in part, remanded in part on other grounds, Ex parte Whisenhant, 482 So.2d 1241 (Ala.1983).
However, despite Dotch’s contention that he was prejudiced by the trial court’s preventing his family to ask for mercy, the record indicates that his family did plead for sympathy and the trial court found these pleas to constitute a nonstatutory mitigating circumstance. The trial court found:
“Mercy: The defendant, his attorneys and family plead for mercy. In addition to the letter received from Garrett Dotch, the Court received letters from his family members and a former basketball coach. Those calls for mercy cannot be rebutted by the State. The Court is also mindful of the tragic and irreplaceable loss suffered by the victim’s family and friends. However, this non-statutory mitigator was injected by the defense, is found to exist and is given some weight.”
(C. 572.)
XIV.
Dotch argues that the trial court abused its discretion in assigning only small weight to the nonstatutory mitigating circumstances of Dotch’s poor mental health.
However, because this matter is being raised for the first time on appeal, it is due to be analyzed pursuant to the plain error rule. Rule 45A, Ala.R.App.P.
The trial court acted within its discretion in determining that the nonstatutory circumstance of Dotch’s poor mental health was to be afforded only small weight in its weighing process.
“‘[T]he weight to attach to [a] known mitigating circumstance is within the discretion of the trial court. See Bush v. State, 695 So.2d 70 (Ala.Crim.App.1995), aff'd 695 So.2d 138 (Ala.), cert. denied, 522 U.S. 969, 118 S.Ct. 418, 139 L.Ed.2d 320 (1997).’ Hodges v. State, 856 So.2d 875, 893 (Ala.Crim.App.2001), aff'd 856 So.2d 936 (Ala.2003).
“ ‘The circuit court must consider evidence offered in mitigation, but it is not obliged to find that the evidence constitutes a mitigating circumstance. As the Alabama Supreme Court has stated:
““‘See Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 *999 (1978); Ex parte Hart, 612 So.2d 536, 542 (Ala.1992) (‘Lockett does not require that all evidence offered as mitigating evidence be found to be mitigating.’), cert. denied, 508 U.S. 953, 113 S.Ct. 2450, 124 L.Ed.2d 666 (1993); and Ex parte Slaton, 680 So.2d 909, 924 (1996) (‘“While Lockett and its progeny require consideration of all evidence submitted as mitigation, whether the evidence is actually found to be mitigating is in the discretion of the sentencing authority.” ’) (quoting Bankhead v. State, 585 So.2d 97, 108 (Ala.Crim.App.1989)).”
“ ‘Ex parte Ferguson, 814 So.2d 970, 976 (Ala.2001).’
“Calhoun v. State, 932 So.2d 923, 975 (Ala.Crim.App.2005), cert. denied, 548 U.S. 926, 126 S.Ct. 2984, 165 L.Ed.2d 990 (2006).”
Spencer v. State, 58 So.3d 215, 257 (Ala.Crim.App.2008), (opinion on return to second remand).
Here, the trial court made the following finding concerning this nonstatutory mitigating circumstance:
“Mental Status: The Court has considered the defendant’s mental health status in conjunction with the statutory mitigating circumstances of ‘extreme mental or emotional disturbance’ and ‘diminished capacity.’ The Court found that the defendant’s mental health status does not support a finding of the existence of either of these statutory mitigating circumstances. However, it is undisputed that the defendant has had mental health problems throughout his life, which have occasionally been treated. The Court finds this to be a non-statutory mitigating circumstance and assigns it some weight. However, this weight is small because the defendant has refused both to pursue available mental health treatment and to take medication prescribed to alleviate his condition. According to the observations of those close to him, the medication was capable of stabilizing Dotch’s otherwise erratic demeanor. The defendant’s justification for avoiding his medication was that it ‘slowed him down.’ ”
(C. 570-71.)
Thus, the trial court found that the non-statutory mitigating circumstance of a history of mental health problems did exist, but attributed little weight to this factor because Dotch refrained from taking his medicine that could have helped him. Although Dotch argues that a mentally ill individual can not be held accountable for refraining from taking his or her medicine, as the trial court pointed out there was evidence that Dotch was capable of giving the reasoned explanation that the medicine slowed him down. The trial court found that because Dotch chose to feel more alert rather than remain mentally stable, the trial court could properly find that his illness was not entitled to much weight.
XV.
Dotch alleges that the trial court abused its discretion in assigning insubstantial weight to the nonstatutory mitigating circumstance of a lack of a stable and nurturing environment during childhood. The trial court made the following findings concerning this nonstatutory mitigating circumstance:
“Lack of Stable and Nurturing Environment: The defendant was born out of wedlock while his mother was in a mental facility due to a nervous breakdown. She was in mental health care facilities, including Searcy Hospital, 12 to 14 times with a diagnosis of paranoid schizophrenia during the defendant’s childhood. The defendant’s mother became addicted to crack cocaine when he *1000 was about 8 years old and remained under its influence for many years. The defendant’s father spent most of the defendant’s youth in the penitentiary and addicted to drugs. When the defendant’s father and mother were together, their relationship was marked by physical violence often committed in the presence of the defendant. As a result of the mother’s mental illness and drug abuse, the defendant was placed in the custody of the Department of Human Resources at age 8. After several years of foster care, the defendant lived with one or more of the mother’s brothers and sisters and for some time lived with a grandmother.
“When the defendant was 14 or 15 years of age, he was confronted by his father in a violent manner while at his grandmother’s home. As a result of this confrontation, the defendant moved into an apartment with his 19 year old brother who thereafter provided the only support and guidance the defendant received. The defendant’s father and mother would visit the apartment in order to steal their children’s belongings and sell them for drugs. The defendant did not learn that the man involved in these events was his father until he was almost 20 years old. The defendant’s mother received a Social Security check for the defendant and would use it to support her drug addiction, although on occasion she would give him some part of the check. The defendant never had a stable wholesome home place or father to provide him supervision and guidance. Any parental influence was provided by foster care or the various siblings of his mother with whom he occasionally and temporarily resided. From age 14 or 15, his only supervision was provided by a brother approximately six years older.
“Accordingly, this Court finds this non-statutory mitigator does exist and gives it some weight. The weight given is not substantial, because many people in our society are exposed to the same troubling conditions but refrain from senselessly murdering innocent victims. The defendant’s older brother shared the same parents and suffered many of the same circumstances as the defendant. Yet, he worked, was productive and provided for the welfare of others.”
(C. 568-70.)
The trial court found and considered Dotch’s difficult upbringing. However, the trial court did not abuse its discretion in according this circumstance insubstantial weight; there was also evidence indicating that other members of Dotch’s family cared for him during his childhood and adolescence. See Brown v. State, 11 So.3d 866, 931-32 (Ala.Crim.App.2007) (finding that the trial court properly considered nonstatutory mitigating circumstances where trial court stated that “ ‘in considering the testimony of both family members, even in the light most favorable to the defendant, finds that this is a nonstatutory mitigating circumstance; however, the mitigating circumstance of an unpleasant home life was totally outweighed by the aggravating circumstances as presented [by] the evidence in this case’ ”). See also Vanpelt v. State, [Ms. CR-06-1539, December 18, 2009] — So.3d —, — (Ala.Crim.App.2009) (nonstatutory mitigating circumstances of difficult family history and diagnosed antisocial personality, as well as statutory mitigating circumstance of lack of prior criminal activity, was outweighed by aggravating circumstance that murder was committed for pecuniary gain). Yancey v. State, 65 So.3d 452 (Ala.Crim.App.2009)(nonstatutory mitigating circumstances of dysfunctional family environment and the jury’s recommended sentence of life imprisonment without parole were outweighed by the aggravating *1001 circumstances). “Although the trial court must consider all mitigating circumstances, it has discretion in determining whether a particular mitigating circumstance is proven and the weight it will give that circumstance. See Williams v. State, 710 So.2d 1276 (Ala.Crim.App.1996), aff'd, 710 So.2d 1350 (Ala.1997).” Newton v. State, [Ms. CR-05-1517, Oct. 2, 2009] — So.3d —, — (Ala.Crim.App.2009) (where Newton contended that the trial court improperly failed to reference nonstatutory mitigating circumstances of his upbringing, his family history, and his accomplice’s sentence, this Court noted that trial court’s order referenced his difficult upbringing and held that the trial court did not abuse its discretion).
XVI.
Dotch argues that the prosecutor committed misconduct during the sentencing phase and that, in doing so, she violated his right to a fair trial. Specifically, he contends that the prosecutor improperly urged the jury to reject the mitigating factors of extreme mental or emotional disturbance and substantially impaired capacity, as well as improperly referred to prior instances of alleged misconduct. Dotch failed to object to these alleged improprieties at the trial court level; therefore, to afford Dotch relief they must rise to the level of plain error. Rule 45A, Ala.R.App.P.
A.
Dotch alleges that the prosecutor improperly encouraged the jury to reject the mitigating factors of extreme mental or emotional disturbance and substantially impaired capacity based on the jury’s finding of guilt. He further argues that the prosecutor conflated the two circumstances by stating to the jury, “Let’s look at these two because I think you look at these two together.” (R. 1565.)
The record indicates that, when making this statement, the prosecutor was commencing her argument to the jury concerning the three alleged statutory mitigating circumstances[18] argued by Dotch and that her entire argument was as follows:
“Let’s look at these two because I think you look at these two together. We’ll take them separately. The murder was committed while the Defendant was under extreme mental or emotional disturbance. Well, ladies and gentlemen of the jury, in our case-in-chief, I think we went over this throughout the entire trial. Dr. Rosen went over this. Dr, McKeown went over this. And you heard Dr. Rosen get back up on the stand in the sentencing phase and allege the same thing he alleged in the trial. And by your verdict, you have already determined this. You determined that their claim of not guilty by — excuse me, not guilty by reason of mental disease or defect was not valid. You found him guilty of this crime. You found that he was able to appreciate the nature and wrongfulness of his acts at the time that he committed this murder.
“So, I submit to you, ladies and gentlemen of the jury, this is not a mitigating circumstance. At the time that he committed this murder, he was not under extreme mental or emotional disturbance. He knew what he was doing. You found that when you found him guilty of capital murder. At the time that he committed this murder, he had the capacity to appreciate the criminali *1002 ty of his conduct. You found that when you found him guilty of capital murder.
“I submit to you, ladies and gentlemen of the jury, this mitigating circumstance does not exist.”
(R. 1565-66.)
It is clear that the same evidence that is introduced for evaluating whether a defendant’s sanity was in question at the time of the offense so as to satisfy the affirmative defense of mental disease or defect may also be looked to for a determination of whether the mitigating circumstances of both substantially impaired and under the influence of mental or emotional infirmity exist. See Ex parte Davis, 554 So.2d 1111 (Ala.1989), rehearing overruled, 569 So.2d 738 (Ala.1990), cert. denied, 498 U.S. 1127, 111 S.Ct. 1091, 112 L.Ed.2d 1196 (1991) (where Davis sought a psychological examination to prove the same two mitigating circumstances, the Alabama Supreme Court held that there was no evidence, including the pretrial mental examinations, indicating that Davis “was under the influence of a mental or emotional infirmity at the time he committed the capital felony that would be relevant to the mitigating circumstances in [Ala.] Code 1975, §§ 13-11-7(2) and (6)” or “that might have [cast] some doubt on [Davis’s] sanity at the time he committed the capital felony.” 554 So.2d at 1118. The court found “no evidence that [Davis’s] mental condition was seriously in question, either at the guilt phase of the trial or at the sentencing phase of the trial.” Id.).
Moreover, the record further indicates that the trial court informed the jury of all the statutory mitigating circumstances, as well as the three mitigating circumstances being argued by Dotch. The court also fully charged the jury as to the burden of proof of the mitigating circumstances, as well as the State’s burden of proof to disprove them if their existence is in dispute.[19] (R. 1611-21.) The jury was also instructed as to its duty in considering and weighing these circumstances. (R. 1612-15.)
There is no indication in the record that the jury was confused by the prosecutor’s comments as to the consideration of the two mitigating circumstances. Nor was there confusion caused by her comments concerning the evidence, including the jury’s decision, from the guilt phase. See Part XII, supra. See also Ferguson v. State, 814 So.2d 925, 962 (Ala.Crim.App.2000) (“Contrary to Ferguson’s contention, merely because the trial court used the word ‘insane’ in its sentencing order and found that Ferguson knew right from wrong does not mean that the court applied the standard of legal insanity to Ferguson’s proffered mitigating evidence. After reviewing the record and the trial court’s sentencing order, we conclude that the trial court did not require Ferguson to prove that he was legally insane in order to show that he was under the influence of an extreme mental or emotional disturbance, that his ability to appreciate the criminality of his conduct was substantially impaired, or that he was under extreme duress or the substantial domination of another person.”).
B.
Dotch argues that the prosecutor improperly mentioned instances of his alleged prior misconduct. He cites her references to fights he got involved in as a youth, a disparaging remark he made about a teacher, his selling drugs as a *1003 teenager, and his choking a housekeeper at a mental-health facility.
The record indicates that the prosecutor argued to the jury that the evidence presented during the guilt phase through records from Dotch’s school and from mental-health facilities at which he was housed[20] refuted his arguments of the existence of the mitigating circumstances of a bleak upbringing and mental illness. The prosecutor referred to mental-health-facility records that characterized Dotch as a manipulator and school records that referred to his fighting, his being suspended for fighting, and his calling his physical-education teacher a “bitch.” (R. 1584.) Defense counsel objected to these comments, and the prosecutor responded that the evidence was relevant to contradict the argued mitigating evidence. The trial judge overruled the objection and stated that he would inform the jury as to how it should consider this evidence.
The prosecutor then referred to Dotch’s drug usage and his suspension from school for having been caught with marijuana in a stolen vehicle. She argued to the jury that Dotch stated in his medical reports at Searcy Medical Facility that he had never taken responsibility for his illegal activities and drug usage and further that he was noncompliant with his medicines. (R. 1585.) She argued that the defense’s argument in mitigation that Dotch and his brother were desolate was negated by Dotch’s self-reported job history; specifically, that he sold drugs, and that he was fired from several short-term jobs for failing to follow rules, yet she noted that he was able to play organized sports in high school. (R. 1586-87.) The prosecutor stated, “And all of this goes to show that the circumstances weren’t quite what they tried to make them seem in the mitigating evidence, ladies and gentlemen.” (R. 1587.)
Thereafter, the prosecutor began to comment on an instance wherein Dotch attempted to strangle a housekeeper at Searcy Medical Facility. Defense counsel objected that the prosecutor was improperly arguing another unauthorized aggravating factor. (R. 1587-88.) The trial court noted that the prosecutor could present evidence to negate a mitigating circumstance; however, the trial court stated that it did not view this evidence as going to that purpose. The trial court therefore instructed the jury to disregard “the beginning” of the prosecutor’s argument “in which she related some prior misconduct.” (R. 1588.)
Defense counsel moved for a mistrial based on the prosecutor’s comments as to the criminal conduct because she says, they were not relevant and were unduly prejudicial. The prosecutor responded that the evidence went to refute the mitigating factor concerning his ability to appreciate the criminality of his conduct or to conform his conduct to the requirements of law. The trial court, however, stated, “I’ve already ruled that I’m not going to let you go into these prior acts in this summation, go into these prior acts that you’ve pulled out of the records that otherwise haven’t been made part of the case-in-chief as part of a closing argument ... for the first time in the sentencing hearing, and so I’m going to sustain the objection to that.” (R. 1590-91.) The trial court then stated that it was sustaining Dotch’s objection to any argument concerning the choking incident because any probative value would be outweighed by its prejudicial effect.
As to the motion for a mistrial, the prosecutor argued that because the jury *1004 had already determined guilt in the first phase of trial, Dotch would not be entitled to a new trial. The judge determined that his curative instructions to the jury to disregard the comments were sufficient to cure any error. (R. 1592.)
Here, the trial court sustained Dotch’s objection to the argument concerning the choking of the housekeeper, instructed the prosecutor that it would not allow reference to the prior acts, and instructed the jury to disregard the prosecutor’s argument “in which she related some prior misconduct.” (R. 1588.) This action by the trial judge was sufficient to cure any error as to the prosecutor’s comments.
“A declaration of a mistrial indicates a miscarriage of justice and is granted only where it is clearly manifest that justice cannot be insured. Chesson v. State, 435 So.2d 177, 181 (Ala.Cr.App.1983); Long v. State, 370 So.2d 354 (Ala.Cr.App.1979).
“Where the trial court immediately instructs the jury not to consider a fact, that instruction, in effect, removes or excludes that matter from the jury’s consideration, and the prejudicial effect of the statement is deemed to be cured by such instruction. Bradley v. State, 450 So.2d 173, 176 (Ala.Cr.App.1983); Richardson v. State, 374 So.2d 433 (Ala.Cr.App.1979). The trial judge’s immediate charge to the jury to disregard an impropriety raises a prima facie presumption against error. Kelley v. State, 405 So.2d 728 (Ala.Cr.App.), cert. denied, 405 So.2d 731 (Ala.1981).
“ ‘The entry of a mistrial is not lightly to be undertaken. It should be only a last resort, as in cases of otherwise ineradicable prejudice. Where error is eradicable a mistrial is too drastic and is properly denied.’ Woods v. State, 460 So.2d 291, 296 (Ala.Cr.App.1984); Chillous v. State, 405 So.2d 58 (Ala.Cr.App.1981).
“ ‘When prejudicial remarks have been made, the trial judge is in a better position than the appellate court to determine whether the remarks were so prejudicial as to be ineradicable.’ Chambers v. State, 382 So.2d 632, 635 (Ala.Cr.App.), cert. denied, 382 So.2d 636 (Ala.1980).”
Soriano v. State, 527 So.2d 1367, 1371 (Ala.Crim.App.1988).
Moreover, the record reveals that during the cross-examination of Dotch’s brother at the penalty phase, he testified that he knew that Dotch “might have smoked some weed from time to time.” (R. 1554.) Furthermore, the trial court also acknowledged that “both sides will rely on all the evidence that was accepted during the guilt phase of the trial.” (R. 1556.) Thus, evidence concerning Dotch’s bad acts, including his drug usage, were properly before the jury at the penalty phase. Cf. Smith v. State, — So.3d — (Ala.Crim.App.2007) (opinion on remand from the Alabama Supreme Court) (State’s reference to prior crimes by Smith during its opening argument that were not all proven at the penalty phase was harmless error because there was evidence admitted at sentencing concerning his extensive criminal history and the trial court instructed the jury that arguments of counsel were not evidence and that only the two aggravating circumstances presented could be considered by the jury.).
“Statements of counsel in argument must be viewed as in the heat of debate and must be valued at their true worth rather than as factors in the formation of the verdict. Hayes v. State, 395 So.2d 127 (Ala.Crim.App.1980), cert. denied, 395 So.2d 150 (Ala.1981); McQueen v. State, 355 So.2d 407 (Ala. *1005 Crim.App.1978); Pickett v. State, 417 So.2d 589 (Ala.Crim.App.1982).”
Orr v. State, 462 So.2d 1013, 1016 (Ala.Crim.App.1984). The trial court instructed the jury that the attorneys’ arguments and comments were not to be viewed as evidence and cured any error in the prosecutor’s reference to prior bad acts by Dotch.
XVII.
Dotch argues that his sentence of death is due to be reversed pursuant to the holding in Ring v. Arizona, 586 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). He alleges that Alabama’s capital-sentencing scheme is functionally identical to the scheme held to be unconstitutional in Ring, because the jury’s verdict is not binding on the court. He further argues that Alabama’s capital-sentencing scheme violates Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), by violating the requirement that any fact that increases the maximum penalty must be proved beyond a reasonable doubt.
In Apprendi, the United States Supreme Court held that a fact that increased a defendant’s sentence beyond the statutory limits, other than the fact of a prior conviction, had to be found by a jury beyond a reasonable doubt. The Court then applied this holding to cases involving the death penalty in Ring, supra.
However, courts in Alabama have determined that Alabama’s sentencing scheme is not unconstitutional under Ring, or Apprendi because the weighing process undertaken to arrive at a capital sentence is not a finding of fact or an element of the offense; therefore, a jury is not constitutionally required to weigh the aggravating and mitigating circumstances. See Ex parte Waldrop, 859 So.2d 1181 (Ala.2002); Beckworth v. State, 946 So.2d 490, 515 (Ala.Crim.App.2005), cert. denied, 549 U.S. 1120, 127 S.Ct. 936, 166 L.Ed.2d 717 (2007). Therefore this issue has already been determined adversely to Dotch’s arguments.
XVIII.
Dotch contends that “evolving standards of decency have rendered Alabama’s method of execution unconstitutional.” (Dotch’s brief, at 116.) Dotch argues that Alabama’s procedures for administering a lethal injection pose a substantial risk of inflicting unnecessary pain and thus violate the Eighth and Fourteenth Amendments to the United States Constitution. He also submits that these procedures violate the provision of the Alabama Constitution 1901, Art. I, § 15, prohibiting cruel and unusual punishment.
The appellate courts of this State have repeatedly held this issue to be meritless.
“This issue has been addressed by recent opinions from this Court. In Saunders v. State, 10 So.3d 53 (Ala.Crim.App.2007), this Court stated:
“ ‘The United States Supreme Court has held that the imposition of the death penalty as a sentence for capital murder is not per se unconstitutional. See Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). In addition, Alabama’s capital-murder statute has been upheld against a variety of constitutional challenges. See, e.g., Clark v. State, 896 So.2d 584 (Ala.Crim.App.2000), and cases cited therein. This Court has also held that lethal injection does not constitute per se cruel and unusual punishment. See, e.g., McNabb v. State, 991 So.2d 313 (Ala.Crim.App.2007), and cases cited therein. Therefore, Saunders’s general claim that the death penalty constitutes cruel
*1006 and unusual punishment is merit-less.’ ”
Jackson v. State, 68 So.3d 201, 206-07 (Ala.Crim.App.2009). See also Vanpelt v. State, [Ms. CR-06-1539, December 18, 2009] — So.3d —, — (Ala.Crim.App.2009) (Vanpelt’s argument that “evolving standards of decency have rendered Alabama’s method of execution ... unconstitutional” held to have been rejected by the United States Supreme Court, the Alabama Supreme Court, and this Court).
XIX.
Dotch argues that the death penalty is especially cruel and unusual punishment when applied to a person who suffers from “long-lasting mental health problems” like himself. (Dotch’s brief, at 118.)
Under constitutional guidelines, in order to be exempt from the imposition of the death penalty, a defendant must meet the definition of mentally retarded, see Ex parte Perkins, 851 So.2d 453 (Ala.2002); Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), or the definition of legal insanity. § 15-16-24, Ala.Code 1975. Moreover, Alabama’s system of weighing the aggravating circumstances and the mitigating circumstances in order to determine whether life imprisonment without parole or death is the appropriate sentence in a case has been held not to be unconstitutional; thus, if the mitigating evidence concerning a defendant’s mental health is determined to outweigh the aggravating evidence, the defendant could not be sentenced to death. § 13A-5-46(e); § 13A-5-48.
In the present case, the jury determined at the guilt phase that Dotch was not legally insane. Thereafter, when determining sentencing, the jury considered evidence concerning the mitigating circumstances that Dotch was under the influence of extreme mental or emotional disturbance and that his capacity to appreciate the criminality of his conduct or to conform it to the requirements of law was substantially impaired. § 13A-5-51(2) and (6), Ala.Code 1975. The jury also considered evidence of the nonstatutory mitigating circumstance concerning Dotch’s mental health and history. The jury determined that this evidence was outweighed by the aggravating circumstances. The trial court, in sentencing Dotch, accorded small weight to the non-statutory mitigating circumstance concerning his mental status and found that the statutory mitigating circumstances in § 13A-5-5K2) and (6), Ala.Code 1975, did not exist and accorded them no weight.
Thus, Dotch was properly sentenced to death, and this Court will not extend or expand the constitutional prohibitions against the application of the death penalty in this case. See Gavin v. State, 891 So.2d 907, 935-38 (Ala.Crim.App.2003), cert. denied, 891 So.2d 998 (Ala.2004), cert. denied, 543 U.S. 1123, 125 S.Ct. 1054, 160 L.Ed.2d 1073 (2005) (Gavin’s claim of cruel and unusual punishment based on a challenge that did not factually apply to his case should not be reached as “ ‘ “the question of a statute’s validity can not be determined abstractly, but rather should be determined only as it applies and is to be enforced in the specific case before the court.” ’ ” 891 So.2d at 937 (quoting other cases)).
XX.
Pursuant to § 13A-5-53, Ala. Code 1975, we are required to address the propriety of Dotch’s conviction and sentence of death. Dotch was indicted and convicted of capital murder because he killed Timarla Taldon by use of a deadly weapon while she was in a vehicle. See § 13A-5-40(17), Ala.Code 1975.
According to Rule 45A, Ala.R.App.P., we have searched the entire proceedings for any plain error and have found none. *1007 Further, pursuant to § 13A-5-53, Ala. Code 1975, we are required to address the propriety of Dotch’s sentence of death. It is the finding of this court that there is no error in the sentencing that adversely affected Dotch’s rights.
The record does not reflect that the sentence of death was imposed as the result of the influence of passion, prejudice, or any other arbitrary factor. See § 13A-5-53(b)(l), Ala.Code 1975.
The trial court found the existence of two aggravating circumstances: that the offense was committed by Dotch when he was under sentence of imprisonment and that Dotch had previously been convicted of a felony involving the use or threat of violence to the person. § 13A-5-49(l) and (2), Ala.Code 1975. The trial court further found the existence of no statutory mitigating circumstances. As to the nonstatu-tory mitigating circumstances, the trial court found the existence of the following circumstances and accorded each “some weight”: Dotch’s lack of a stable and nurturing environment during childhood, Dotch’s long-term abuse of illegal drugs, Dotch’s mental-health problems, Dotch’s capacity to love and care for others, and Dotch’s, his family members’, and his attorneys’ pleas for mercy. (C. 568-72.) The trial court further indicated in its sentencing order that it considered the jury’s recommended sentence of death by a vote of 10 in favor of death to 2 in favor of life imprisonment without parole and gave it due weight under the law.
In weighing the aggravating circumstances against the mitigating circumstances, the trial court determined:
“Timarla Taldon was a young woman loved by her family, and she did not deserve her fate. She supported herself while continuing her education. Garrett Dotch tormented her and would not let her live in peace. He twice pleaded guilty to committing crimes against her, yet he continued to harass and threaten her. Garrett Dotch, acting with unexplainable malice, violently ended Timarla Taldon’s promising young life.”
(C. 574-75.)
The trial court determined that the aggravating circumstances outweighed the mitigating circumstances. The trial court’s findings concerning the existence and weighing of these circumstances are supported by the record.
It is the finding of this Court that death is the proper sentence in this case. Section 13A-5-53(b)(2), Ala.Code 1975, requires this court to weigh the aggravating circumstances and the mitigating circumstances independently to determine the propriety of Dotch’s sentence of death. An independent weighing of the aggravating and mitigating circumstances indicates that the trial court’s determination was proper and that death is the proper sentence.
As required by § 13A-5-53(b)(3), Ala. Code 1975, this Court must determine whether Dotch’s sentence was disproportionate or excessive when compared to the sentences imposed in similar cases. The penalty in this case is neither disproportionate nor excessive when compared to the penalties imposed in similar cases, considering the circumstances surrounding both the crime and Dotch. See, e.g., Key v. State, 891 So.2d 353 (Ala.Crim.App.2002); Knight v. State, 907 So.2d 470 (Ala.Crim.App.2004).
After carefully reviewing the record of both the guilt phase and the sentencing phase of Dotch’s trial, and for the reasons expressed here, we affirm Dotch’s conviction and sentence.
AFFIRMED.
*1008 WELCH, WINDOM, and KELLUM, JJ., concur. WISE, P.J., concurs in the result.

. On cross-examination, Sayer admitted that she had never mentioned any gun or what might have been a gun to the police when she gave her statement to them. (R. 697.)

. Her statement was taken approximately an hour after Taldon's body had been found. (R. 695.)

.On cross-examination, when asked why she had never told the police that she had seen the man shoot into the vehicle, Slack maintained that she had told someone what she had seen but that she was uncertain whether it had been written down. (R. 713-14.)

. Dotch’s expert testified that Dotch suffered from delusional disorder of an unspecified type; polysubstance abuse; and personality disorder, not otherwise specified, with antisocial, schizoid, paranoid, and borderline features. (R. 1111.)

. To the extent that Dotch incorporates his argument that the men in the array varied as to physical attributes, this issue has already been discussed and held meritless. See Part I.A., supra.

. Wright contended that his photograph appeared in all three lineups, but the record showed that his photograph was included in only two of the three.

. Moore was shown the second photographic array depicting participants in profile.

. However, when testifying as to what she had seen at trial, she referred to a time gap of "a couple of minutes” between watching the two persons talk and hearing the gunshots. (R. 722.)

. Dotch states in his brief on appeal that he is 6'4". (Dotch's brief, at 40.)

. Rule 13.2(e), Ala.R.Crim.P., provides for a motion for more definite statement when an indictment fails to include sufficient details or facts to support the charge to apprise a defendant of the exact charge he or she must defend against. Dotch made no such motion.

. The charges here were properly consolidated because the crimes were " ' " 'of a same or similar character so that a person evaluating the crimes would believe that the offenses were committed by the same person.’ ” ’ ” Culver v. State, 22 So.3d 499, 508 (Ala.Crim.App.2008), cert. denied, Culver v. State, 22 So.3d 530 (Ala.2009), cert. denied, Culver v. Alabama, - U.S. -, 130 S.Ct. 462, 175 L.Ed.2d 308 (2009). Moreover, evidence concerning each of these offenses would have been admissible in the trial for the other offense. Id.

. See West v. State, 586 So.2d 999, 1000 (Ala.Crim.App.1991) ("'Insanity is an affirmative defense, and a defendant who raises it must prove "by a preponderance of the evidence and to the reasonable satisfaction of the jury,” Magwood [v. State], 426 So.2d [918], 921-22 (Ala.Crim.App.1982), that he was insane at the time of the offense. Magwood, 426 So.2d at 922. See also McKinnon v. State, 405 So.2d 78, 80 (Ala.Cr.App.1981). Demos v. State, 555 So.2d 1169, 1173 (Ala.Cr.App.1989).”).

. See, as to inconsistent verdicts, People v. Florida, Crim. No. 96-00060A (D. Guam App. Div. April 21, 1997) (when the jury was presented with separate verdict forms for aggravated murder and three lesser-included of-tenses, it was held to be reversible error to include not guilty by reason of mental disease or defect as an option only on the aggravated-murder verdict form).

. Another potential juror, who was white, worked for the Mobile County Health Department; however, she was removed for cause.

. SeeSSR. 33.

. The record reveals that the prosecutor used her second strike to remove the potential juror known by the cited juror, and the next strike was used to remove the cited venire-member.

. Although Dotch did not specifically raise the ground of exclusion of minorities and women by death-qualifying the jury in his pretrial motion, he did argue that the practice denied him the right to a fair cross-section of the community on his jury. (C. 174.)

. Dotch also argued that his age at the time of the murder was a statutory mitigating circumstance.

. The jury was not improperly informed that the standard of proof for these mitigating circumstances was as high as that for the affirmative defense of mental disease or defect. Ivery v. State, 686 So.2d 495, 503 (Ala.Crim.App.1996).

. It should be noted that these records were introduced by Dotch at the guilt phase.